## HENRY O. GILBERT, RESPONDENT, *v.* LEONARD G. QUINLAN, APPELLANT.

*Agreement to pay commissions for business furnished — when no time is set for its termination, it can be ended; when and how.*

One Quinlan, a grain broker, agreed to give to Henry O. Gilbert one-half of the commissions received by the former upon sales made for customers brought to him by Gilbert. No time was fixed when the contract should end. Some time after the contract was made, and after it had been acted upon, the board of trade of Chicago, at which Quinlan dealt, reduced the commissions on grain sales one-half, and thereupon Quinlan notified Gilbert that he could no longer pay him said one-half.

*Held,* that the contract was terminable.

That all that was necessary to justify Quinlan in refusing to continue to pay the commission was reasonable notice to Gilbert, and a good reason for his own course, not arising simply out of a desire to avoid payment of further commissions.

APPEAL by the defendant Leonard G. Quinlan from a judgment, entered in the office of the clerk of the county of New York on the 14th day of May, 1890, for $1,379 in favor of plaintiff; and also from an order, entered in said office on the 12th day of May, 1890, denying defendant's motion for a new trial.

The action was brought to recover one-half of the total amount of brokerage received by the defendant, a grain merchant, upon purchase sales made by the defendant under the employment of one Miner, a customer brought to the defendant by the plaintiff. The defendant claimed that he had by reason of a change in the rules of

the board of trade of Chicago, given the plaintiff notice that he would not any longer carry out the agreement made between them as to the payments to be made to the plaintiff out of the commissions earned by the defendant in business procured through the plaintiff.

*Hatch & Warren*, for the appellant.

*W. W. Niles, Jr.*, for the respondent.

Van Brunt, P. J.:

This action was brought to recover for services in procuring customers for the defendant, who was a stock and grain broker, which the plaintiff alleges he became entitled to by procuring a customer for defendant by the name of Miner.

The contract sworn to by the plaintiff was that defendant agreed to give him half commissions for all the custom that the plaintiff brought him. There was a question in the case as to whether this one-half applied to the total amount of the commissions upon the transactions or only to the amount of the commissions actually received by the defendant, which question was resolved by the jury in favor of defendant.

It is conceded that Mr. Miner was first introduced to the defendant by the plaintiff, and that his transactions through the defendant were to a considerable amount; and the jury found that the plaintiff was entitled to commissions received upon the whole of these transactions. It was sought to be proved by the defendant that by reason of a change in the rules of the board of trade of Chicago he could not pay commissions to the plaintiff upon these transactions in the then future, and that he notified the plaintiff of the termination of their agreement; and that all the transactions with Miner which formed the basis of the subject-matter of this action took place after such notification.

The fact that he gave the plaintiff such notification was corroborated by disinterested witnesses, and is, indeed, admitted by the plaintiff. He says, upon cross-examination, in answer to the question "Can you tell anything that was said about Miner and your business relations in that conversation" (referring to a conversation had between the plaintiff and the defendant in regard to the change of

rates made by the board of trade)? "Nothing, except that I told Mr. Quinlan that Mr. Miner was trading there, and, of course, that he ought to keep on paying me the same as he had done; that I should not stand it unless he did; I brought the customer there, and when he got fairly started he did not want to pay me any more." He said further, "The subject did come up between myself and Quinlan that he did not want to pay me any commissions."

This evidence clearly shows that conversations, substantially as claimed by defendant in regard to the payment of commissions, did come up, and that defendant had notified the plaintiff that he would not pay him any more commissions in consequence of the change of rules made by the board of trade, sworn to by the defendant and two of his witnesses.

In the submission of the case to the jury the court instructed the jury that this contract was one which could not last forever. It was one that was terminable at the election or option of either party; that it would have been proper for the plaintiff at any time to have taken his customer to another broker; and it was entirely competent for the broker at any time, on giving reasonable notice, to have said to him, "The relation that exists here between Mr. Miner, your customer, and myself is now severed, and hereafter it is terminated." There was no exception to this charge, but the court was requested by plaintiff to charge "that in a contract like that, if they find the agreement was to pay half the commissions on that customer's trade, they must stop trading with the customer, so he will be turned back, or else they must have the plaintiff assent to the termination of the contract, one or the other."

This the court declined to charge and an exception was taken. The jury found a verdict in favor of the plaintiff, and from the judgment thereupon entered, and from the order denying a motion for a new trial on the ground, among others, that the verdict was contrary to the evidence, this appeal is taken. It is clear, upon an examination of the evidence in this case, that if the instruction of the court in reference to the terminable character of the contract was correct, the verdict is against the evidence.

The only question submitted to the jury, outside of the question as to the amount of the commissions, was as to whether the notice of termination of the contract claimed by the defendant had been

given. That such notice was given was testified to distinctly by the defendant and two witnesses, and their evidence was in no respect shaken. That such notice was given seems to be conceded by the testimony of the plaintiff given upon cross-examination, as above stated. It is true, he says, that at this conversation neither of the two witnesses who were examined on behalf of defendant were present. But the language of the plaintiff is entirely inconsistent with the idea that such notice was not given. He says that the defendant had to keep on paying him the same as he had done, and he should not stand it unless he did. And in another place that the subject came up between himself and the defendant that he did not want to pay him any commissions; and in another place that there was not any one present when Quinlan told him he would not pay him any more commissions. And in answer to the question, " How many times did he tell you he would not pay ? " he answered, " He told me so once ; I do not recollect him telling me any more."

This was a clear corroboration of the testimony of the defendant and his witnesses that this conversation did take place, and that this notice was given. There was no evidence whatever contradicting, in any material particulars, the evidence of the notification, and the jury should have found in favor of the defense upon that issue.

There is only one other point to be considered, and that is whether, upon the whole case, as matter of law, the plaintiff was entitled to the direction of a verdict for the amount for which the jury rendered their verdict. That depends upon whether the request to charge, which has been adverted to, was correct, and that it was error to refuse it.

We do not think that a contract of the kind mentioned mortgages a customer forever. It is true that such a contract cannot be terminated at once, but only after the lapse of a reasonable time and for a good motive. But the simple notification of the cancellation of such a contract does not prevent the having of dealings by a party with that customer at some subsequent time without being liable to the payment of commissions to the introducer. Good faith must be at the foundation of the action of the party seeking to terminate the contract. He cannot terminate the contract merely for the purpose of getting rid of the payment of commissions. But where a

good reason arises and proper notice is given, the contract may be terminated. The agent, if he chooses, may take his customer elsewhere if he has sufficient control over him so to do, which it would appear in this case, from the evidence, that he did not have.

The cases cited upon the part of the appellant, namely, *Briggs* v. *Rowe* (4 Keyes, 426); *Briggs* v. *Boyd* (56 N. Y., 291); *Sibbald* v. *Bethlehem Iron Co.* (83 id., 378) and *Wylie* v. *Maine National Bank* (61 id., 415), have no application whatever to the case at bar; they all being cases in respect to employment for particular services which had not been accomplished by the broker.

Upon the whole case we are of the opinion that the verdict was against the weight of evidence, and that the order denying the motion for a new trial should be reversed upon that ground; that the judgment should also be reversed upon payment by the appellant of the costs of the trial; and that a new trial should be ordered, with costs to appellant to abide the event.

DANIELS, J., concurred.

Order and judgment reversed upon payment by the appellant of the costs of the trial, and a new trial ordered, with costs to appellant to abide event.