POWERS & COMPANY, INC., *v.* AMERICAN SOCIETY OF TOOL ENGINEERS.

1. CONTRACTS — SALE OF ADVERTISING SPACE — CONSTRUCTION OF CONTRACT.

Finding of trial court that the obtaining of an order for advertising space was considered as a sale even though under the custom of the trade the advertiser could cancel at will is not disturbed in trade magazine publisher's action against the owner of the magazine for compensation and commissions on advertising space in issues published by defendant after termination of the contract which insertions had been solicited during the life of the contract.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 12 Am Jur, Contracts § 260.
[2] 2 Am Jur, Agency § 298 *et seq.*
[4] 3 Am Jur, Appeal and Error §§ 1226, 1227.
[5] 14 Am Jur, Costs § 11.

2. Principal and Agent—Termination of Agency Contract—Compensation.

An agent under an agency contract that is terminated without breach thereof by either party is not entitled to compensation for services not yet rendered on sales subsequently made, in the absence of some understanding otherwise, though entitled to compensation accruing before the termination, or to a pro rata compensation for services already rendered, or their reasonable value, if such services were part of the agreed consideration.

3. Contracts—Publication of Trade Magazine—Compensation for Advertising Inserted After Termination of Publication Contract.

The publisher of trade magazine was entitled to compensation pursuant to formula set forth for determination thereof in contract for publication of defendant's trade magazine for such advertising as it had sold prior to the termination of the contract but which was not inserted pursuant to "advertising" contracts until after the publisher's contract with the owner had been terminated without breach thereof by either party.

4. Appeal and Error—Remand of Nonjury Case—Measure of Damages—Publication Contract—Later Advertising.

Nonjury law action by trade magazine publisher against defendant owner is reversed and remanded for determination of amount owing plaintiff in compensation pursuant to formula set forth in contract for advertising space sold in the magazine during life of the contract but not inserted until after the termination thereof with leave to make appropriate amendment on motion in the circuit court (Court Rule No 64 [1945]).

5. Costs—Partial New Trial.

No costs are allowed in action to recover compensation under a publishing contract, where plaintiff is allowed to recover but cause is remanded for determination of damages pursuant to apportionment announced, which may have been misapprehended (Court Rule No 64 [1945]).

Appeal from Wayne; Webster (Arthur), J. Submitted January 3, 1956. (Docket No. 8, Calendar No. 46,554.) Decided April 2, 1956. Rehearing granted May 14, 1956. See 346 Mich 697.

Action by Powers & Company, Inc., a Michigan corporation, against American Society of Tool Engineers, a Michigan corporation, for commissions under advertising contract. Judgment for plaintiff. Defendant appeals. Affirmed in part, reversed in part and remanded for partial retrial.

*Charles W. Bishop,* for plaintiff.

*Clyde L. Fulton* (*Frederick O. Knauer,* of counsel), for defendant.

BLACK, J. Defendant-appellant's statement of facts, set forth in brief under Court Rule No 67 (1945), has been accepted by plaintiff-appellee. We find that it fairly presents the questions brought here for review and therefore incorporate same into this opinion as follows:

"The defendant is a Michigan nonprofit corporation organized and existing for scientific and educational purposes. In the early summer of 1944, and for a period of time prior thereto, the defendant's house organ, a technical and trade magazine bearing the name 'Tool Engineer,' was being published monthly for it by an organization known as Bramson & Company. For reasons not appearing in the record, the defendant desired to make other arrangements, and as a consequence entered into negotiations with one Robert B. Powers who was at that time engaged in the publication management business under the assumed firm name of Kenyon & Company.

"A written contract was executed on December 7, 1944, by the defendant society and Robert B. Powers, doing business as Kenyon & Company, under the terms of which Kenyon & Company agreed to do 'all things necessary for the printing, publishing and distributing' of 'Tool Engineer' magazine. The defendant society in turn agreed, *inter alia,* to 'furnish

all necessary capital for the payment of salaries and expenses for the editorial, advertising and general business activities of the publication and for all printing, publishing and mailing costs' and to pay to Kenyon & Company '15% of the net advertising income derived from the sale of advertising,' the same to be computed and paid monthly, plus 'a sum of money equal to 25% of the net profits from the publication of "Tool Engineer",' which amount was to be computed and paid yearly.

"Although there was some preliminary work done as early as September, 1944, the first issue of 'Tool Engineer' which Kenyon & Company published was that of February, 1945. When the revenue from the advertising which appeared in that issue was received, Kenyon & Company was paid its first compensation.

"Each month thereafter, during the year 1945, 'Tool Engineer' was published by Kenyon & Company, and in each issue, with the exception of that of March, there appeared advertising.

"After each advertising-bearing issue of the magazine was published and the advertisers had paid their bills, the publisher, Kenyon & Company, would automatically receive its 15% compensation.

"On January 1, 1946, the defendant society entered into a verbal agreement with the plaintiff, Powers & Company, Inc., a Michigan corporation, which agreement was ultimately reduced to writing on January 2d of the next year, and it was upon this contract that the plaintiff subsequently brought suit.

"The need for this second contract was occasioned in part by the fact that Robert B. Powers, formerly operating as Kenyon & Company, had, at about this time, incorporated his business under the name of Powers & Company, Inc. A further necessity for the execution of a new contract was the fact that the defendant society wished to have published an annual directory of its then 18,000 members, for which no provisions had been made in the earlier contract.

"This contract of January, 1947, contained in it an expression of the desire of the parties 'to supersede said original contract by a new contract which shall clarify said original contract and make certain additions thereto and changes therein and provide for the continuation of the purposes of the former contract, of December 7, 1944, and to provide for the continuation of the functions performed by Kenyon & Company through the publisher,' Powers & Company, Inc.

"Paragraph 5 recited the provision that 'The society shall pay Powers & Company, Inc., 15% of the net receipts from advertising space sales in both "Tool Engineer" and "ASTE Directory," the same to be computed and paid monthly in regard to the "Tool Engineer" * * * .'

"Paragraph 9 set forth the provision that 'Net receipts in regard to advertising space sales, is hereby determined to be the gross receipts from advertising space sold, less agency and space representatives commissions paid, and discounts allowed.'

"A provision for further compensation to be paid by the defendant society to the plaintiff corporation was contained in paragraph 6, *viz.*, 'The society shall further pay to Powers & Company, Inc., in addition to the above, 25% of the net receipts secured through the publication of "Tool Engineer," same to be computed as of September 30th of each year, and paid over to Powers & Company, Inc., on or before October 20th, following.'

"The contract also provided that 'The society shall furnish all necessary capital for the payment of salaries and expenses for the editorial, advertising and general business activities of both publications and for all printing, publishing and mailing costs in behalf of the "Tool Engineer" and the "ASTE Directory." '

"The primary obligations of the plaintiff were set out in the contract as follows:

" '13. Powers & Company, Inc., shall do, or employ others to do under its supervision, all things neces-

sary for the editing, printing, publishing and distributing of said publications, which duties shall include, but not be limited to, the following, to-wit:

" 'A. Obtaining copyrights in behalf of the society on all issues of said publications;

" 'B. Obtaining contracts for advertising in said publications;

" 'C. Organizing and maintaining and supervising an editorial, advertising and business staff for said publications, subject to the approval of the society;

" 'D. Printing and publishing said publications, and distributing same by mail to persons named by the society;

" 'E. Handling all art, mechancial, binding and mailing operations;

" 'F. Providing all paper required for the publications without interruption or delay.

" 'G. Issuing the "Tool Engineer" monthly with an advertising and an editorial content subject to the approval of the society acting through its editorial committee, and publishing the "ASTE Directory" annually and within 60 days after the annual meeting of the society, on the same basis.'

"In accordance with its terms this contract was eventually terminated on December 7, 1949, exactly 5 years after the execution of the original contract, by notice to the plaintiff that the defendant society did not intend to renew the agreement at end of its life. The notice, in letter form, was sent in late November of 1948, thereby giving the plaintiff slightly more than the 1-year's notice required by the provisions of the contract.

"It is undisputed that the 'Tool Engineer' was published each month during the life of the contract and that the plaintiff, Powers & Company, Inc., received its 15% of the net receipts from the advertising which appeared in editions published during that time. It is likewise undisputed that the plaintiff was fully compensated for its efforts in connection with the 'ASTE Directory,' and received all to which it was entitled under the 25% profit-sharing provi-

sion of the contract relating to the publication of 'Tool Engineer.'

"The only claim advanced by plaintiff is for 15% of the net receipts from certain advertising which was published and appeared in 'Tool Engineer' subsequent to December 7, 1949, the effective termination date of the contract under which the parties were dealing.

"There is no dispute as to the advertising in question, the net amount received therefrom, or the percentage and amount due the plaintiff, if, in fact, it is entitled to recover. It is plaintiff's right to any recovery which the defendant society disputes.

"As to many of the facts and circumstances which existed during the period in question, there is basic agreement between the parties. For example, it is agreed that the advertising in question was solicited by solicitors or salesmen who, while supervised by the plaintiff, were on the payroll of the defendant society.

"It is also agreed that the advertising in question was solicited prior to the termination date of the contract between the plaintiff and the defendant, but was printed and appeared in editions of 'Tool Engineer' published and issued after that date by plaintiff's successors, the defendant society's own employees. Likewise it is agreed that this advertising was not paid for by the various advertisers until after such time as it had actually appeared in the magazine.

"In general, the testimony offered to show the method employed in soliciting and procuring orders for advertising space in 'Tool Engineer,' during the period in question, is in harmony. According to that testimony, the solicitors contacted current and prospective advertisers, either directly or through their respective agencies, and endeavored to secure from them an indication of the amount of space which they might use in 'Tool Engineer' for advertising purposes during a forthcoming period of time, usually a calendar or fiscal year. These indications

of the advertisers, as reduced to written form, are throughout the record referred to alternately as 'advertising contracts,' 'advertising orders,' 'space contracts,' and 'space reservations.' (Hereafter, for the sake of simplicity and consistency, the term 'advertising contracts' will be employed herein.)

"The prospective advertisers executed these 'advertising contracts' primarily to protect themselves against rate increases by the publication during the contract period. Inasmuch as advertising space is sold in units, as are other things, the 'advertising contracts' were also used to establish a basis for invoicing the advertiser. That is to say, that 12 pages of space used during a given year, for example, would cost the advertiser less per page than would a single page used during that same period, and, therefore, an advertiser who had indicated in an 'advertising contract,' his intention to use 12 pages during the year would be billed each month from the start at the lower 12-page rate. If, however, at the end of the year the advertiser had not in fact used the 12 pages of space, he then became obliged to pay, for the page or pages actually used, the difference between the slightly higher 'short rate' and the '12-page rate' at which he had previously been invoiced.

"In order to have any advertisement actually appear in 'Tool Engineer,' or any similar publication, an advertiser must do more than merely execute an 'advertising contract.' He, or his agency, must each month prepare and forward to the publisher an 'insertion order' or 'copy instruction' and, except in the rare instance where the publisher is to prepare the ad, the advertisement as it is to appear. Without these things, the publisher is without either authority or ability to publish anything for that advertiser.

" 'Insertion orders' or 'copy instructions,' so-called, are employed by advertisers and advertising agencies to inform the publisher as to what material is actually to appear, as well as the amount of space which they wish to use in a particular issue. These

'insertion orders' are detailed instructions to the publisher which contain the agency's ad number, the title of the advertisement, the space to be used, et cetera, so that there will be no mistake as to where the ad comes from or to whom it belongs. The plate from which the advertisment is to be printed usually accompanies or follows the 'insertion order,' and any copy which the publisher is to set is ordinarily attached right to the 'insertion order.'

"If a prospective advertiser, who has executed and entered into an 'advertising contract,' neglects or refuses to send in monthly 'insertion orders,' the publisher is without redress. He can neither publish anything for that advertiser, nor hold him for space not used.

"Further, an advertiser, having once sent in his monthly 'insertion order' and advertising setup, can cancel that order at any time before the passing of a published deadline date with impunity. (The sole exception or dispute on this question has to do with positions on the cover of a publication, which situation is not presented in the case at bar.) However, on this subject the plaintif's witness testified that there was a requirement in such cases that the cancellation be 'for cause.' The defendant society's witnesses implied that there need be no cause shown so long as cancellation was made prior to the established deadline.

"In any event, it is agreed that an advertiser, even though he has executed an 'advertising contract,' may, by failing to send 'insertion orders' to the publisher, or by cancelling 'insertion orders' already sent, utilize none of the space which he has indicated in the 'advertising contract' he intended to use, without thereby rendering himself liable to the publisher in any amount whatever. Likewise, an advertiser can utilize but part of the space called for in his 'advertising contract' without incurring any liability except to pay for the space actually used, plus a sum 'equal to the difference, if any, between the amount due at the rate named in the contract and

the amount due at the rate applicable to the quantity of space used.' * * *

"Allan Ray Putnam, who was employed by the defendant society as plaintiff's successor, testified that he and his staff made a continuing effort to bring in the 'insertion orders' from the advertisers. To this end, they notified each advertiser of the deadline date for the coming issue so that he would be aware that it was time to place his 'insertion order.' They made mail, telephone or personal contact with all advertisers or agencies that failed to send in their copy or 'insertion order,' to encourage them to do so. They made regular contact with every advertiser on an average of once every 90 days to stimulate his interest in 'Tool Engineer' and insure that his 'insertion orders' would continue to come in each month.

"Robert B. Powers, president of the plaintiff, and plaintiff's only witness, testified that 'advertising contracts' are solicited from the media department of an advertising agency, while the 'insertion orders,' mere mechanical follow-ups, issue from the production department. It is with the production department that contact is made by the publisher if no 'insertion order' is received.

"In the instant case it is agreed that while some of the 'advertising contracts' solicited during the life of the contract for publication after its termination were not fulfilled by the advertisers, a large percentage of them were, and it is only upon those that plaintiff bases any claim for recovery.

"Approximately 80 to 90% of the advertising in question was solicited from advertising agencies acting on behalf of their clients. The 'advertising contract' used by these agencies contained either the standard conditions adopted by the American Association of Advertising Agencies, or conditions very similar to them.

"The advertising which was not solicited from agencies was covered by 'advertising contracts' written on the defendant society's own form (exhibit 12)

or on the advertiser's own purchase orders (exhibit 13).

"An 'advertising contract' offered as representative of the standard form used by the A.A.A.A. was received in evidence as exhibit 7.

"Seven of the 'advertising contracts' upon which plaintiff based its claim were offered by the defendant society as being representative of all of the 'contracts' in question, and were so received in evidence as exhibits 9, 10, 11, 12 and 13.

"A 'rate card' setting forth the published rates, terms and conditions subject to which advertising was placed and accepted in 'Tool Engineer,' during the period in question, was offered by the defendant society and was received in evidence as exhibit 14.

"On August 10, 1953, the plaintiff filed suit in assumpsit in the circuit court for the county of Wayne demanding judgment for an amount equal to 15% of the net receipts from advertising which was solicited prior to December 7, 1949, the termination date of the contract, but which was published in 'Tool Engineer' and paid for during a period of 13 months after that date.

"On August 20, 1953, the sheriff filed his return and on September 4, 1953, the defendant society filed a special appearance and a motion to dismiss. The motion was heard and denied by Hon. Guy A. Miller, circuit judge, on September 25th.

"Defendant filed its answer to the plaintiff's declaration on October 30, 1953, and the plaintiff filed its reply thereto on November 14th. A pretrial statement was filed on December 17, 1953.

"Trial was commenced on March 10, 1954, before Hon. Arthur Webster, circuit judge, who heard the cause without a jury.

"Plaintiff called Robert B. Powers, its president, as its only witness.

"Defendant called Allan Ray Putnam, its publishing manager, and A. F. Denham, an advertising agency executive and member of the defendant society, as its only witnesses.

"On March 12, 1954, trial was concluded. The learned trial judge filed an opinion on May 20, 1954, in which he held that 'in light of their previous dealings' the parties considered the procuring of 'advertising contracts' as 'sales' within the meaning of the contract, and the plaintiff was, therefore, entitled to recover. To support its position, the trial court stated that if such an interpretation were not correct 'the plaintiff's solicitors would not be under any inducement to contract for any advertising which would run beyond December, 1949,' the termination date of the contract.

"Judgment in the amount of $13,686.34 plus $46.35 costs was entered in favor of the plaintiff on June 4, 1954."

We are asked to hold, by defendant-appellant, that Judge Webster's finding and judgment is unsupported by evidence—also that same is against the preponderance of the evidence.

*First:* Plaintiff offered, and the trial judge received in absence of objection, credible evidence disclosing "the manner in which the business had been previously conducted between them (meaning the parties hereto)." Judge Webster said, in his first opinion:

"In my opinion the intention of the parties in the contract before the court is to be determined by the manner in which the business had been previously conducted between them. The sales of advertising space were considered sales even though under the custom of the trade the advertiser could cancel at will. These parties continuing their relationship with each other by this new contract thought of the contract in the light of their previous dealings. Its meaning then to my mind is that they considered the obtaining of the order for advertising space as a sale. If this was the intention of the parties then it is my opinion that the plaintiff is entitled to recover."

The judge then went on to say, by supplemental opinion:

"So in the case at bar, I tried to find out what the intention of the parties to the contract was when they used the language in paragraphs 5 and 9 of the contract. For that purpose the court had before it evidence of the dealings of the parties under the first contract as well as the one before the court which continued their relationship."

At this point our agreement with quoted conclusions of Judge Webster is declared. We do not agree, for reasons presently given, with his conclusion as to the measure of plaintiff's recovery.

Since the foregoing evidence was not objected to, and since it does tend to shed light upon the contractual intention of the parties, defendant-appellant is in no position to insist that the trial court was not possessed of right to construe the mentioned contract in light thereof (*Pandaleon v. Brecker*, 227 Mich 297; *Hoek v. Township of Allendale*, 161 Mich 571 [21 Ann Cas 118]; *Steadman v. Keets*, 129 Mich 669; *Hirschfield v. Franks*, 112 Mich 448). We therefore proceed to determination of reviewable questions upon view of the contract itself plus the precedent circumstances that are mentioned and evaluated in the quoted portion of the trial court's opinion.

*Second:* The mentioned 1947 contract viewed with precedent circumstances is typical of the class of agency agreements that are considered in 2 Restatement, Agency, §§ 448-452, p 1050 *et seq.* The rules given there accurately reflect the tests by which remedies under terminated contracts of such nature are to be determined and we accordingly adopt the following as presently relevant guide (section 452):

"Compensation upon Termination Without Breach by Either Party; General Rule.

"Unless otherwise agreed, if the principal has contracted to pay the agent for his services and the relationship terminates without breach of contract by either party, the principal is subject to liability to pay to the agent for services previously performed and which are part of the agreed exchange:

"(a) the agreed compensation for services for which compensation is apportioned in the contract; and

"(b) the value, not exceeding the agreed ratable compensation, of services for which the compensation is not apportioned."

The contract being silent with respect to apportionment under division "(a)" above, and there having been no express understanding with respect to plaintiff's partially earned compensation at time of termination, it may fairly be said that the situation duplicates that which is dealt with under heading "comment" on page 1063 of Restatement, that is to say, it is the same as where parties mutually agree upon a termination of their relationship without agreement as to compensation for past services. On such foundation, and we deem it sound, the prosperous result of "advertising space sold" through plaintiff's efforts prior to termination, combined with post-termination edition and publication by defendant, brings into play the foregoing rule of apportionment.

Plaintiff's right to commission-compensation from advertising space sold prior to termination but published and paid for thereafter did not, of course, accrue until publication and payment took place. If the contract had not been terminated December 7, 1949, plaintiff would have been obligated prospectively to pursue paragraph 13 of the contract to satisfy its right thereto. Said paragraph 13 (quoted in the preceding statement of facts) necessarily had to be executed by defendant, not plaintiff, following

the termination date so far as advertising sales made prior to termination are concerned—hence, our duty to observe the rule quoted above.

It is ruled that the plaintiff is entitled to recover the apportioned value of its services rendered prior to December 7, 1949; that such value should be determined on proofs addressed to the relative worth of such services as were rendered by plaintiff prior to termination and are reflected in the ultimately paid advertising revenues, and that the case should be remanded for such purpose and for partial new trial under Court Rule No 47, § 2 (1945). Such partial retrial will be limited to determination, on new evidence to be taken according to the mentioned apportionment rule, of that which in essence is a question of fact, *i.e.*, the proportionate value of plaintiff's services which resulted with post-termination activity of defendant in receipt of the agreed advertising revenues.

The rule we adopt, as aforesaid, is echoed in 2 Am Jur, Agency, § 310, page 242, as follows:

"Apart from the particular manner of terminating the agency relation, it may be observed generally that if there is no breach of contract by either party, as where the agency contract is canceled by mutual consent or by virtue of an express reservation, or is canceled for cause, the agent is not entitled to compensation for services not yet rendered or sales subsequently made, in the absence of some understanding otherwise, though he may be entitled to the compensation which has accrued before the termination, or to a pro rata compensation for services already rendered, or to their reasonable value, if such services were part of the agreed consideration."

The same text, at succeeding page 244, Agency, § 311, recites:

"In the absence of any agreement the law implies a promise on the part of the principal to pay what

the services are reasonably worth. In such cases it is sometimes said that the agent is entitled to the fair and just value of his services, determined in the light of the surrounding circumstances and in the light of what others receive for like services."

*Third:* The most baffling problem in this case is presented by the agreement of counsel that "there is no dispute as to the * * * amount due the plaintiff, if, in fact, it is entitled to recover." If this amounts to an agreement, and Judge Webster undoubtedly was led to accept it as such, that plaintiff is either entitled to recover the full amount of its claim ($13,686.34) or nothing, then affirmance of the judgment in that amount is indicated. On the other hand, and if counsel have misapprehended the quoted apportionment rule, it would be quite unjust to require defendant to pay the whole when it is obviously obligated to pay a lesser amount. We are constrained in these circumstances to set the present judgment aside and to remand with directions, as herein noted, pursuant to Court Rule No 64 (1945).

To avoid possible misunderstanding, it is noted that *Gee* v. *Olson,* 320 Mich 274, has been carefully considered, and that we find nothing in it tending to support or oppose our conclusion that the aforesaid apportionment rule should be fitted to the facts of this case. We note further that plaintiff did not declare on the common counts. In view of our determination that plaintiff is entitled to recover the apportioned value of its services rendered prior to contract termination, an appropriate amendment may be allowed on motion in the circuit court.

Remanded, with direction of partial retrial for determination of the amount of plaintiff's commission-compensation and entry of new judgment thereon. No costs to either party.

Dethmers, C. J., and Sharpe, Smith, Reid, Boyles, Kelly, and Carr, JJ., concurred.