ROBERTS ASSOCIATES, INC., a
Michigan corporation, Plaintiff,

v.

BLAZER INTERNATIONAL
CORPORATION, a foreign
corporation, Defendant.

No. 90–70644.

United States District Court,
E.D. Michigan, S.D.

June 28, 1990.

Opinion on Reconsideration July 26, 1990.

Randall Gillary, Vandeveer Garzia, Birmingham, Mich., for plaintiff.

Samuel W. Witwer, Jr., Witwer, Burlage, Poltrock & Giampietro, Chicago, Ill., Frederick G. Buesser, III, Buesser, Buesser, Blank, Lynch, Fryhoff & Graham, Bloomfield Hills, Mich., for defendant.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

This is a suit for the recovery of sales commissions. Defendant Blazer International Corporation (Blazer) terminated plaintiff, Roberts Associates, Inc. (Roberts) as its exclusive manufacturers representative for certain parts sold to the automobile industry. Roberts sues Blazer for failure to pay commissions on post-termination sales to accounts it originally procured. Blazer moves to dismiss the complaint on the grounds that the contract between the parties only obligated Blazer to pay commissions on sales that Roberts actually made. In the alternative, Blazer moves for summary judgment, arguing that there is no evidence that Roberts actually procured the accounts on which it now claims commissions. The Court finds that neither the contract nor the law of Michigan requires defendant to pay continuing commissions simply because Roberts originally introduced the customers to Blazer. If plaintiff is entitled to commissions at all, it must be for sales that it actually procured.

### II.

Blazer manufactures automotive lighting equipment for both the factory-installed original equipment market (OEM) and the after sale market. In 1978, Roberts' predecessor in interest, Edward Roberts, Sr., entered into a manufacturers' representative relationship with Blazer. In 1982, Edward Roberts, Sr. took his son, Edward Roberts, Jr., into the business full-time and subsequently incorporated under the name Roberts Associates, Inc.

On December 15, 1982, defendant sent plaintiff the following letter confirming its understanding of the scope of plaintiff's agency relationship and the rate of compensation:

Dear Ed [Roberts, Sr.]:

I am pleased to confirm that Roberts Associates is the exclusive representative for Blazer International for the following OEM Accounts:

General Motors Corp.
Ford Motor Company
American Motors Corp.
Chrysler Corp.

The following is a list of products we sell to these various accounts:

MM 55 Hand Held Spotlight
MM 56 Hand Held Spotlight with Flasher & Cover
IL 200D Clear Fog Lamp Kit
QR 1C Replacement Quartz Halogen Bubl [sic]
GM 41SD Stainless Steel Amber Fog Lamp Kit

Roberts Associates will be paid 5% commission on these items and any other items they may sell to OEM Accounts. Ed, this confirms my understanding of your agreement with Peter Koehler. Please advise me if I may be of further assistance.

At the time, plaintiff did not object to defendant's characterization of their agreement.

In 1982, Blazer was awarded a substantial contract to supply original equipment

fog lamps to the Inland Fisher Guide Division of the General Motors Corporation (Fisher Guide). In 1985, defendant paid to plaintiff a commission of $68,574.50 on the Fisher Guide account and in 1986 defendant paid plaintiff $33,248.87 on the account. Defendant felt, however, that the amount of commissions plaintiff was earning on the Fisher Guide account were excessive compared to the amount of work required, and in the spring of 1986, defendant informed plaintiff that it would reduce its commissions on the account to no more than $2,000 per month. On November 1, 1986, defendant ceased all payments to plaintiff for on Fisher Guide account. Defendant continued to pay plaintiff commissions on other accounts as stated in the 1982 letter.

Edward Roberts, Sr. died in 1988. On August 3, 1989, defendants sent plaintiff a letter informing it that Blazer decided to handle all of its OEM representation "in-house" and was terminating Roberts as its manufacturers representative, effective in thirty days.

### III.

Plaintiff makes three separate but related claims. First, it argues that it is entitled to commissions for all subsequent sales to accounts that it initially procured for Blazer. Second, plaintiff contends that it is entitled to continuing commissions on all sales to accounts over which it was granted exclusive representation in the December 1982 letter for as long as Blazer sells the stipulated parts to those accounts. Third, plaintiff argues that the 1982 letter did not accurately represent its agreement with Blazer. Each claim will be treated in turn.

### A.

Plaintiff argues that it was responsible for procuring the Fisher Guide account for Blazer. Defendant disputes this, and has submitted several affidavits suggesting that Blazer secured the account solely

through its own in-house efforts and that plaintiff played no role in the transaction.[1] Although this may present an issue of fact as to plaintiff's entitlement to commissions prior to his termination, it does not preclude dismissal of his claim for post-termination commissions.

■ The obligations of the parties to a sales agency agreement are primarily governed by the terms of the contract.

[W]hether an agent or broker ... is entitled to commissions on sales made or consummated by his principal or by another agent depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretation, all the circumstances must be considered.

*Reed v. Kurdziel*, 352 Mich. 287, 294, 89 N.W.2d 479 (1958), *quoting*, Anno., *Agent–Commission on Sale By Another*, 12 A.L. R.2d 1360, 1363 (1949). Where the contract is silent, the agent is entitled to recover a commission on a sale, whether or not he personally concluded it, only where it can be shown that his efforts were the "procuring cause." *Reed*, 352 Mich. at 295, 89 N.W.2d 479.

■ The question of whether an agent is entitled to continuing commissions on accounts which he has introduced to the principal, but which the principal subsequently appropriates for himself, has never been directly addressed by Michigan appellate courts. However, a brief analysis of the relevant authority suggests that no such right exists.

■ It is well settled that where a principal enters into a non-exclusive representation agreement with an agent, he is not thereby precluded from competing with the agent personally or through another agent. Restatement (Second) Agency, § 449. Where the agent nonetheless successfully procures a sale over the competition of his principal, he will, of course, be entitled to his commission. However, both the Michigan cases and the Restatement

---

**1.** Defendant subsequently hedges on this position. In his affidavit, Steve Rovtar concedes that plaintiff was at least partially responsible for procuring the Fisher Guide account. Rovtar Aff. Para. E.

interpret the concept of "procuring cause" quite narrowly. *See Powers & Co. v. American Society of Tool Engineers*, 345 Mich. 392, 75 N.W.2d 824 (1956); *Case v. Rudolph Wurlitzer Co.*, 186 Mich. 81, 152 N.W. 977 (1915); Restatement (Second) Agency, § 448. As explained in *Wood v. Hutchinson Coal Co.*, 176 F.2d 682 (4th Cir.1949), where the agent does not participate in the negotiation of a given contract of sale with a customer, he is not the procuring cause, even though the agent may have originally introduced the customer to the principal. In *Wood*, a coal company retained an independent sales agent to sell its coal pursuant to a non-exclusive commission agreement. After twelve years, the coal company circumvented the agent, surreptitiously negotiating a new five-year contract with a customer which he had originally procured. The court held that plaintiff was not the procuring cause of the contract because he played no role in its negotiation.

> An attempt is made to meet the requirements of Section 448 of the Restatement [ (First) of Agency] Section 448 by advancing the theory that Milwaukee was Wood's customer and hence Wood was entitled to commissions on all Milwaukee's purchases. This position, however, cannot be maintained. For obtaining the customer and making the first sale Wood was entitled to and was paid the agreed commissions, but that situation did not continue indefinitely. It is well established that the successful negotiation of a contract by an agent does not give him a right to commissions on renewal, which he does not secure, in the absence of an express contract to that effect. The contract did not provide that commissions would be paid on all purchases made by Milwaukee or any other particular customer as is sometimes provided in a broker's contract, but only on such sales as the agent would make. He did not actually make the sale in question.

*Id.* at 684. The *Wood* court reasoned that a broker could protect himself from an unscrupulous principal by drafting protective language in the agency agreement or by attempting to lure away the customer's

business if he can. The Court finds it significant that the Michigan Supreme Court cited the A.L.R. annotation accompanying the *Wood* case in *Reed v. Kurdziel* and expressed no disagreement with its reasoning or holding. Also persuasive is the Court of Appeals for the Sixth Circuit's recent observation that "[u]nder Michigan law announced in *Reed v. Kurdziel*, 352 Mich. 287, 89 N.W.2d 479 (1958), this court must conclude that it was the acquisition of orders, not the acquisition of the customer that is protected by the "procuring cause" doctrine ..." *William Kehoe Associates v. Indiana Tube Corp.*, 891 F.2d 293 (6th Cir.1989) (unpublished disposition). Finally, the Court is persuaded by the cogent reasoning of *Wood* and is satisfied that the Michigan Supreme Court would adopt that rule if called upon to do so.

Plaintiff cites *Militzer v. Kal–Die Casting Corp.*, 41 Mich.App. 492, 200 N.W.2d 323 (1972), as supporting an agent's right to collect continuing commissions on sales to customers which it has procured. This reliance is misplaced. In *Militzer,* the court expressly found that the agency agreement promised the agent "a 5% commission on all *sales to customers he procured* in Western Michigan...." [emphasis added]. The Michigan Court of Appeals explained that

> If plaintiff's contract had called for a 5% commission for every "sale" made instead of every "customer" procured, then renegotiation in light of shared successes would have been justified as "fair dealing" under the rule of *Reed v. Kurdziel.* However, the 5% commission was conditioned on "customer" procurement, not sales completed.

*Id.* at 495, 200 N.W.2d 323.

■ It is clear that plaintiff has no valid claim to commissions on the Fisher Guide account after the date of its termination. There is no allegation that plaintiff had an exclusive agency agreement as to the parts sold to the Fisher Guide account which would preclude Blazer from appropriating the accounts during the life of the agreement. Nor did the 1982 agency agreement guarantee commissions for all sales to *cus-*

*tomers* procured by plaintiff. Rather, the agreement merely promised commissions for *sales* to OEM accounts. This was precisely the distinction emphasized by the Michigan Court of Appeals in *Militzer*, 41 Mich.App. at 495, 200 N.W.2d 323. Finally, it is undisputed that plaintiff had nothing to do with sales to Fisher Guide following its termination. As a matter of law, he could not have been the procuring cause of those sales.

█ The status of plaintiff's claims to commissions before his termination is more ambiguous. Defendant alleges that it was solely responsible for servicing the Fisher Guide account and that plaintiff had nothing whatever to do with it. Plaintiff does not discuss what, if any, role it played in procuring additional sales after initially securing the account. Thus, the Court is unable to determine at this time whether plaintiff has any claim to additional commissions on the Fisher Guide account on a procuring cause theory.[2]

### B.

Plaintiff's second contention is that it is entitled to continuing commissions on all sales to accounts over which it was granted exclusive representation in 1982 for as long as Blazer sells those parts. It is undoubtedly true that plaintiff had an exclusive agency agreement as to the listed parts and accounts and that defendant was precluded from competing with him for those sales. During the term of his employment, plaintiff was entitled to receive a commission on all of those listed parts, irrespective of whether it was the procuring cause of the sale. Plaintiff seems to allege that some of the commissions on those accounts during his period of employment were wrongfully withheld. The case will have to proceed to trial on these claims.[3]

**2.** Plaintiff also claims that defendant violated its duty of fair dealing by denying it continuing commissions and terminating its sales agency. The Court finds that this duty is adequately discharged by the principal compensating the agent for sales which he actually procured. *Reed v. Kurdziel*, 352 Mich. 287, 89 N.W.2d 479. Because the concept of fair dealing is subsumed within the procuring cause doctrine, it is unnec-

### C.

In its supplemental brief, Roberts alleges that the 1982 confirmatory letter did not accurately represent its agreement with Blazer. Plaintiff cites the affidavit of Edward Roberts, Jr., which states that it was his understanding that Roberts was entitled to a 5% commission for all sales made of the parts identified in the 1982 letter for "life of part" or for as long as those parts were sold by Blazer to the OEM accounts. He also states that plaintiff was entitled to a 5% commission for any part orders procured and sold to new accounts for the life of the part. Plaintiff argues that summary judgment is inappropriate at this stage because a factual dispute exists as to the actual terms of the agreement.

█ This testimony is inadmissible parol evidence. Plaintiff concedes that its "understanding" of the arrangement with Blazer was derived from negotiations and agreements made prior to or contemporaneously with the December 15, 1982 letter. It is well settled in Michigan that oral evidence of prior or contemporaneous understandings is inadmissible to vary or contradict an unambiguous writing which is intended to memorialize the complete agreement between the parties. *NAG Enterprises v. All State*, 407 Mich. 407, 409, 285 N.W.2d 770 (1979). Extrinsic evidence is, of course, admissible to show that the written agreement is not integrated or only partially integrated. *Id.* at 410, 285 N.W.2d 770. In addition, where the agreement is facially ambiguous, extrinsic evidence is admissible to show the actual intent of the parties and aid in the construction of the contract. *Goodwin v. Coe Pontiac, Inc.*, 392 Mich. 195, 209–10, 220 N.W.2d 664 (1974). Even where there is no facial ambiguity, extrinsic evidence is ad-

essary to consider it as a separate and independent obligation.

**3.** It is beyond doubt that defendant had the right to discharge plaintiff at will, provided it give sufficient notice. Indeed, the Court does not understand plaintiff to contest its termination or the notice period.

missible to show the existence of a latent ambiguity. *Id.* at 206, 220 N.W.2d 664.

The evidence offered by plaintiff falls into none of the recognized exceptions to the general rule. All plaintiff wishes to show is that the terms of the 1982 letter meant something quite different than the terms themselves state. Plaintiff has offered no evidence challenging the fact that the letter was an integrated agreement. It sets out all of the essential terms of a standard sales representative agreement. It also contains a statement declaring that the terms of the letter "confirm [Blazer's] understanding of your agreement with Peter Koehler." The terms plaintiff seeks to impose are merely different from, rather than additional to, those stated in the letter.

Nor does the Court find that the agreement contained in the December 15, 1982 letter is ambiguous. It sets out the standard terms of a sales agency agreement. When read in conjunction with the well established law concerning sales commissions, the terms of the agreement are plain and clear.[4] If the parties intended to fundamentally alter the terms of the standard sales agency agreement, they were obligated to expressly state as much. The Court will not admit evidence of any prior oral understandings not clearly expressed in the written instrument.

### IV.

In light of the foregoing, plaintiff's claims for continuing commissions after his termination are DISMISSED. The parties will proceed to trial on plaintiff's claims for commissions on sales in which he actually consummated or procured. Plaintiff may recover commissions only on sales which were the subject or the result of discussions, negotiations, quotations, or pre-sale customer services in which plaintiff actual-

ly participated. The deputy clerk will schedule a status conference.[5]

SO ORDERED.

### ON RECONSIDERATION

### I.

Plaintiff has moved for reconsideration of the Court's June 28, 1990 Memorandum and Order holding that it was not entitled to commissions for post-termination sales made to accounts that it had originally procured. Specifically, plaintiff asks for clarification of the Court's ruling as to its claim for commissions on parts explicitly referenced in defendant's December 15, 1982 letter (December 15 letter). Plaintiff states that it procured the original purchase orders for most of the parts referenced in the letter, and that after the first annual "blanket order" is obtained "Defendant is virtually assured the future sales."

The Court's June 28, 1990 Memorandum and Order states that plaintiff is entitled to commissions only on sales which were the result of discussions, negotiations, quotations, or pre-sale customer services in which it actually participated. Memorandum and Order at 5–6, 11. There is one caveat to this rule, however, which the Court failed to discuss in its previous opinion. If subsequent purchase orders are submitted by a customer which involve no additional servicing or negotiation, then the salesman securing the original account may well be entitled to commissions on those sales. Of course, in the usual case each subsequent order will require some further customer services and under those circumstances the agent securing the previous order will have no claim for additional commissions. It is a question of fact for the jury whether subsequent purchases were effectuated by additional customer services or were made solely on the force of the original representations.

---

**4.** Despite plaintiff's vigorous assertions that he is entitled to continuing commissions for all sales to *customers* he originally procured, the law is clear that, absent any agreement to the contrary, a salesman is entitled only to commissions for *sales* he actually makes. Plaintiff has not cited a single case to the contrary.

**5.** The Court's ruling on defendant's motion to dismiss and motion for summary judgment expressly moots plaintiff's motion to amend the complaint.

## II.

Plaintiff also points out a confusion in the Court's opinion as to the status of its pre-termination commissions on the Fisher Guide account. Plaintiff points out that defendant's December 15 letter stated: "Roberts Associates is the *exclusive representative* for Blazer International for the following OEM Accounts: ... General Motors Corp." [emphasis added]. Fisher Guide is a division of General Motors. According to plaintiff, it was entitled to commissions on sales to that account prior to its termination, regardless of whether it was the procuring cause. The Court overlooked the point in its June 28, 1990 Memorandum and Order. Having now had an opportunity to consider the matter, the Court is of the view that it is without merit.

Most jurisdictions distinguish between two types of exclusive representation agreements. *See generally* 3 Am.Jur.2d, *Agency*, § 268, at 768–69 (1986); Anno., *Agent–Commission on Sale By Another*, 12 A.L.R.2d 1360, 1379 (1949). The first type, known as an "exclusive right to sell," confers on the agent the sole right to sell certain goods or property for a stipulated period or in a given geographic area. Under an exclusive right to sell arrangement, the agent is entitled to commissions on all sales regardless of whether they are made by another agent or the principal himself. The exclusive agent need not be the procuring cause. *Agency*, at 769; Anno., 12 A.L.R.2d at 1379. The second, and more common type of exclusive representation contract is known as an "exclusive agency." Under this arrangement, the principal is only precluded from employing other agents to sell the goods or property. The principal may, however, sell the goods or property himself without incurring liability to the "exclusive" agent, so long as the agent was not the procuring cause of the sale. Restatement (Second) Agency, § 449 comment c (1958) ("A contract to give an "exclusive agency" to deal with specified property is ordinarily interpreted as not precluding competition by the principal personally but only precluding him from appointing another agent to accomplish the result."); *Agency*, at 769; Anno., 12 A.L.

R.2d at 1379. The mere fact that a contract declares that it grants an "exclusive agency" is not conclusive as to which type of exclusive representation arrangement exists between the parties. Rather, a court must look to all of the surrounding circumstances of the contract and independently determine the specific intentions of the parties. Restatement, § 449 comment c; *Agency* at 768; Anno., 12 A.L.R.2d at 1379.

The Court has been unable to locate any cases directly addressing the question of whether the Michigan Supreme Court would adhere to the distinction between an "exclusive right to sell" and an "exclusive agency." However, this distinction is recognized in a majority of jurisdictions and it appears to be conceptually sound. The Court is of the view that the Michigan Supreme Court would follow these courts and recognize the distinction if called upon to do so.

Applying the foregoing rule to the facts of the case sub judice, it is clear that the December 15 letter described an exclusive agency arrangement rather than an exclusive right to sell. The letter explicitly stated that "Roberts Associates will be paid 5% commission on these items and any other items *they may sell* to OEM Accounts." [emphasis added]. This suggests that plaintiff was entitled to commissions only for sales which it personally made. Moreover, it has been held that an intent to give an agent an exclusive right to sell must appear from the unequivocal terms of the agreement or by necessary implication. *Agency*, at 768–69. No such intent can be inferred from the December 15 letter. If the parties had agreed that plaintiff would have a right to commissions on any sale to the so-called "Big Four" auto makers, regardless of whether it was the procuring cause, they could have explicitly so stated.

If the Court was to accept plaintiff's interpretation of the contract, plaintiff would necessarily be entitled to commissions for any other sales defendant made to the Big Four, in addition to Fisher Guide. This would have constituted a substantial portion of defendant's total sales. During the course of the parties' associa-

tion, defendant handled at least some of its sales in-house. However, plaintiff does not appear to be claiming commissions on in-house sales besides those made to Fisher Guide. The Court is loath to adopt an interpretation of the agreement which would compensate plaintiff all out of proportion to its efforts or its business value to Blazer.

### III.

Accordingly, with the clarifications above, the Court adheres to its previous disposition of defendant's motion to dismiss and for summary judgment. The case will proceed to trial on the question of whether plaintiff was fully compensated for sales for which it was the procuring cause, including the Fisher Guide sales.