91 F.3d 143
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ARTIST RIGHTS ENFORCEMENT CORP., Plaintiff-Appellee/Cross-Appellant,
v.
Donald STORBALL, Defendant-Appellant Cross-Appellee.
 Nos. 95-1010, 95-1057.
 United States Court of Appeals, Sixth Circuit.
 July 23, 1996.
 
 Before: DAUGHTREY and MOORE, Circuit Judges, and FORESTER, District Judge.[1]
 PER CURIAM.
 
 
 1
 In this diversity contract case, the plaintiff, Artists Rights Enforcement Corporation, alleged that its president, Charles Rubin, orally agreed with defendant Donald Storball to attempt to sell Storball's renewed copyright to his song "Cool Jerk" in return for a one-third commission on the sale. The district court, after a non-jury trial, determined that the parties had entered into such an oral agreement, that Storball had agreed to sell his rights in the song after Rubin presented him with a buyer, and that Storball breached the oral contract by subsequently selling his rights to the same buyer through another agent. Because the district court's findings of fact are not clearly erroneous, we affirm the court's judgment on the merits. However, because the district court failed to award pre-judgment interest on the amount of the judgment, it is necessary to remand the case for a proper calculation of the amount of interest that Storball owes Artists Rights.
 
 I. FACTUAL BACKGROUND
 
 2
 The defendant-appellant, Donald Storball, wrote and recorded the song "Cool Jerk" in 1966. Since that time, he has sporadically received royalties as a result of the recording, through his membership in Business Music Incorporated, a union that monitors the use of musicians' works in order to assure them their royalties. In 1992, Charles Rubin, the president of plaintiff-appellee Artists Rights Enforcement Corporation, wrote Storball a letter suggesting that Artists Rights could help him collect more in the way of royalties to which he was entitled. After assuring himself of the company's legitimacy, Storball telephoned Rubin to express his interest. They signed a contract in which Storball agreed to pay Rubin 50 percent of any royalties that Rubin collected for Storball, and Rubin agreed to pay any necessary attorney expenses out of his half of the royalties. While attempting to gain royalties from the use of "Cool Jerk" in three movies, Rubin became concerned about who owned the copyright to "Cool Jerk" upon expiration of the initial copyright agreement between Storball and McLaughlin Publishing Company. Rubin testified that an initial copyright lasts for 28 years, after which time one can renew the copyright for another 28 years. The copyright for "Cool Jerk" was due to expire on January 1, 1995, and Rubin was unsure about whether Storball had sold the "renewal rights" as well as the initial copyright to McLaughlin, or whether Storball had retained his renewal rights. Rubin testified that he asked Storball to find a copy of his songwriter's agreement with the initial music publisher in order for Rubin to pursue the claims against the movie producers. Neither Storball nor Rubin was successful in getting a copy of the songwriter's agreement from the original publisher. However, a short time later Rubin received a telephone call from Ed Arrow of the music publishing company Lieber and Stoller. Arrow indicated that Lieber and Stoller wanted to buy the renewal rights to "Cool Jerk."
 
 
 3
 According to Rubin's testimony, he spoke to Storball soon thereafter and explained Arrow's call. Rubin testified that although he did not have a copy of the songwriter's agreement and thus could not be assured that Storball owned the renewal rights, "that if [Storball] did have the rights of renewal, and that we came to an understanding there, for a one-third fee I would see it through, and I would evaluate the asset to see what the maximum amount of money would be available for the sale of the copyright and we'd take it from there." According to Rubin, Storball agreed to this arrangement, although the agreement was not reduced to writing.
 
 
 4
 After Rubin received a copy of the songwriter's agreement from Lieber and Stoller,[2] he sent Storball a copy, indicated that Storball had retained ownership of the renewal rights, and stated that he would review Storball's royalty reports to assess a value for the renewal rights. In return, Storball sent Rubin the royalty reports. Furthermore, at Rubin's request, Storball sent a list of his heirs, information necessary for the drafting of the sale agreement. Rubin testified that after both he and Arrow reviewed the royalty reports, Arrow offered between $200,000 and 250,000 for the renewal rights. Storball indicated that he wanted at least $300,000, Rubin testified, and so he redoubled his efforts, ultimately eliciting an offer of $350,000, which Storball accepted. Rubin then wrote an acceptance letter to Lieber and Stoller and sent Storball a copy of the letter on November 15, 1993.
 
 
 5
 Rubin denied that Storball told him that he was not authorized to make the sale. Rubin did indicate, however, that Storball called him after receiving the acceptance letter and expressed his uncertainty about the most advantageous time to collect the money for tax purposes. Rubin also testified that Storball "said that he also just wanted to make certain that this was a good deal and that, you know, he loves the number, but he just wanted to check around because he just wanted to make sure that this was a good deal." Rubin testified that in early December he received a call from a man named Charles Gilreath, who suggested that Rubin's commission was too high and that Rubin should lower it because he had only an oral agreement with Storball. After that conversation, Rubin sent Storball a kindly-worded letter and a promotional packet from Lieber and Stoller. In January 1994, however, Rubin received a letter from Storball's attorneys informing Rubin that he had not been authorized to enter into the contract with Lieber and Stoller and rejecting the sale.
 
 
 6
 Donald Storball testified that he never gave Rubin authority to sell his renewal rights. Storball admitted contracting with Rubin for help receiving his unpaid royalties, and he acknowledged that Rubin suggested exploring the possibility of the sale of Storball's renewal rights.[3] Although he admitted that Rubin informed him of his ownership of the renewal rights, and offered to sell them for a 33 percent commission, Storball claims that he was uninterested in selling his rights because Rubin was pressuring him. Storball testified that when he received Rubin's letter confirming the sale to Lieber and Stoller, he called Rubin to tell him that he lacked authority for the sale, and that Rubin threatened to sue him. This testimony, however, conflicted with Storball's deposition testimony admitting that he did not remember talking to Rubin after receiving his letter about the sale. At trial, Storball admitted sending Rubin the royalty reports, but insisted that he sent them for Rubin's work obtaining unpaid royalties, not for Rubin's use in valuing the renewal rights, although the past royalty reports were unnecessary in obtaining future royalties. Similarly, Storball claims that he sent Rubin a list of his heirs in connection with the initial contract to obtain royalties, although the list of heirs, too, was unnecessary in obtaining royalties. Finally, Storball acknowledged entering into a written contract with Charles Gilreath, to whom Storball agreed to pay a 20 percent commission for the sale of the renewal rights. In June of 1994, with Gilreath as his agent, Storball sold his renewal rights to Lieber and Stoller for $375,000.
 
 
 7
 The district court found that Storball breached his oral contract with Rubin, who had found him a buyer for his renewal rights and was entitled to a third of the sale price. Because the parties had no written agreement about the sale of renewal rights, the court looked to circumstantial evidence of the contract's existence and content. The court first observed that the parties had a written contract for Rubin to pursue the collection of Storball's royalties, and that Storball had admitted checking Rubin's reputation before entering that contract. The court found that both parties admitted discussing the sale of Storball's renewal rights. It noted that Exhibit 6, a letter from Rubin to Storball, enclosed a copy of Storball's songwriter's agreement, confirmed Storball's ownership of his renewal rights, and indicated that Rubin would review the royalty reports to assess the value of the rights. After receiving this letter, Storball sent Rubin the royalty reports, suggesting his acknowledgment of Rubin's need for them in the valuation process. Furthermore, Storball sent Rubin a list of heirs, information needed to draft the sale agreement for the renewal rights. Moreover, the court found Rubin's telephone log consistent with his testimony. The court concluded that despite his desire to explore the tax consequences of the sale, Storball accepted the $350,000 offer presented by Rubin. Thus, the court found that Rubin was entitled to his commission of $116,666.67, with post-judgment interest and costs. The court, however, denied pre-judgment interest. Storball appeals the judgment, while Artists Rights appeals the denial of pre-judgment interest.
 
 II. ANALYSIS
 
 8
 In this contract case invoking federal diversity jurisdiction, the parties implicitly agree that Michigan law governs. Michigan, the defendant's residence and the state where the plaintiff sought to do business, has the most significant relationship to the alleged contract at issue. Chrysler Corp. v. Skyline Indus. Servs. Inc., 528 N.W.2d 698, 701-3 (Mich.1995). Michigan law requires an offer, acceptance, and consideration for the making of a contract. Kirchhoff v. Morris, 275 N.W. 778, 780 (Mich.1937). In reviewing the trial court's assessment of the facts supporting the existence of a contract, this court abides by the principle that "[f]indings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a).
 
 
 9
 The district court did not clearly err by finding facts establishing the elements of a contract for Artists Rights to sell Storball's renewal rights for a one-third commission. Exhibit 6, a letter from Rubin to Storball, confirmed Storball's ownership of the copyright renewal rights, attached Storball's original copyright sale, and indicated that Rubin would review the defendant's royalty reports to determine the value of the renewal rights. The fact that Storball subsequently sent Rubin copies of the royalty reports, as well as information about his heirs that was necessary in drafting the sale agreement, suggests that Storball agreed that Rubin would try to sell the renewal rights. Rubin's letter to Storball confirming the sale is further circumstantial evidence of an oral agreement between them. Based on these facts, we conclude that the trial court did not clearly err by concluding that the parties entered into an oral contract for Rubin to sell Storball's renewal rights for a commission of one-third of the sale price.
 
 
 10
 The defendant disputes several aspects of the court's finding. He first argues that the parties had not agreed on Rubin's right to act as Storball's agent in the sale of the renewal rights, nor had they agreed on a sale price for those rights. The court, however, found facts sufficient to prove by a preponderance of the evidence that Storball agreed for Rubin to pursue the sale of the renewal rights, and later accepted Lieber and Stoller's $350,000 offer. This factual finding is not clearly erroneous.
 
 
 11
 Secondly, Storball argues that the court found that the parties entered into a contract for Rubin to attempt to sell the renewal rights, whereas Rubin testified that the alleged contract required an actual sale before Rubin's commission was due. This argument, however, misconstrues the district court's opinion, which not only states that the plaintiff contracted to "make an effort to try to sell the renewal rights," but that the plaintiff would get paid "one-third for the sale of those renewal rights." The court clearly interpreted the contract to require the actual sale of the renewal rights, not merely an effort to sell them, before any commission was due. Thus, the court's finding is consistent with the evidence as elicited in Rubin's testimony.
 
 
 12
 Third, Storball insists that Rubin's own testimony confirms that Storball never accepted Lieber and Stoller's offer. According to Rubin's testimony, Storball stated "that he also just wanted to make certain that this was a good deal and that, you know, he loves the number, but he just wanted to check around because he just wanted to make sure that this was a good deal." Although this testimony weakens the credibility of Rubin's previous testimony that Storball agreed to the sale price, the district court did not clearly err by determining that the preponderance of the evidence established Storball's acceptance of the $350,000 offer.
 
 
 13
 Fourth, the defendant insists that Rubin, as Storball's agent under a written contract, breached his fiduciary duty to Storball by using information received as Storball's agent as a means of injecting himself as a middleman to Storball's disadvantage. Rubin's testimony, however, indicated that after he received the call from Ed Arrow, Rubin telephoned Storball to explain his conversation with Arrow. After having revealed this information to Storball, Rubin did not breach his fiduciary duty by agreeing to pursue negotiations for a one-third fee. The court obviously believed Rubin when he testified that he told Storball about Arrow's interest in buying the rights. We simply have no basis upon which to find that the district court clearly erred or to second-guess the court's determination of credibility.
 
 
 14
 Fifth, Storball argues that the plaintiff is not entitled to a commission because he did not conclude the sale. The defendant first notes that an agent's entitlement to a commission depends primarily on the parties' intentions and the interpretation of the contract between them. Reed v. Kurdziel, 89 N.W.2d 479, 482-3 (Mich.1958). He insists that the parties' agreement in this case required a final sale before the plaintiff was entitled to a commission. Even if this court view the contract as silent regarding the plaintiff's commission, however, Storball cites Michigan law stating that an agent is entitled to his commission, whether or not he personally concludes the sale, if his efforts were the "procuring cause" of the sale. Reed, 89 N.W.2d at 483; Roberts Assocs., Inc. v. Blazer Int'l Corp., 741 F.Supp. 650, 652 (E.D.Mich.1990). Storball insists that Rubin was not the "procuring cause" of the sale. However, Gilreath was aware of Rubin's work in negotiating a sale price of $350,000 with Lieber and Stoller, and subsequently sold the rights to Lieber and Stoller for little more than Rubin had negotiated. Rubin's efforts, therefore, could easily be construed as the "procuring cause" of the final contract.
 
 
 15
 Finally, Storball argues that the policy behind Michigan's statute of frauds should protect him. Under M.C.L. § 440.1206(1),
 
 
 16
 [e]xcept in cases [involving contracts for the sale of goods, securities, or security agreements,] a contract for the sale of personal property is not enforceable by way of action or defense beyond $5,000.00 in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.
 
 
 17
 This section is designed to govern the sale of general intangibles, such as royalty rights. See M.C.L. § 440.1206 cmt. This provision, which would govern the sale of a copyright, does not govern the agency contract between Artists Rights and Storball, however. Storball nevertheless seeks to extend the statute's protective policy to participants in an agency contract. His only support for this extension of the law is a case in which the Michigan court of appeals refused to uphold a real estate agent's commission in the absence of a written contract. In that case, however, a Michigan statute required all real estate commission agreements to be in writing to be enforceable. Schultes Real Estate Co., Inc. v. Curis, 425 N.W.2d 559 (Mich.App.1988). Schultes does not provide precedent for extending the statute of frauds beyond its statutory meaning, and we would indeed be reluctant to undermine the law stated in Reed.
 
 
 18
 Storball argues several other minor points, none of which would entitle him to relief at this stage of the proceedings. On the other hand, it appears that the defendant, Artist Rights, is entitled to relief under M.C.L. § 600.6013(6) (1995) (as amended in 1987), governing interest on judgments rendered on unwritten contracts. That provision states that "interest on a money judgment recovered in a civil action shall be calculated at 6-month intervals from the date of filing the complaint...." (Emphasis added.) The statute does not give the district court discretion in awarding pre-judgment interest. Both parties agree that if the plaintiff is entitled to a judgment on the contract, then pre-judgment should be included in that judgment.
 
 
 19
 For the reasons stated above, we AFFIRM the judgment of the district court awarding the plaintiff $116,666.67, but REVERSE the court's denial of prejudgment interest and REMAND the case to the district court for a calculation of the proper amount of interest due.
 
 
 
 [1]
 The Hon. Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [2]
 Although the record is unclear about this fact, Lieber and Stoller appears to have been the co-publisher of "Cool Jerk." And while it was not a party to Storball's initial sale of his copyright, Lieber and Stoller therefore had access to the initial songwriter's contract
 
 
 [3]
 Although in the transcript Storball refers loosely to his ownership of the songwriter's agreement, he obviously intends to refer to his renewal rights in the copyright