## WOOD v. HUTCHINSON COAL CO.
### No. 5907.

United States Court of Appeals
Fourth Circuit.

Argued June 29, 1949.

Decided Aug. 27, 1949.

James M. Guiher, Washington, D. C. (Steptoe & Johnson, Clarksburg, W. Va., and Joseph T. Davis, Washington, Mo., on brief), for appellant.

Mary Frances Brown and W. G. Stathers, Clarksburg, W. Va. (Stathers & Cantrall, and Arch M. Cantrall, Clarksburg, W. Va., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Leighton S. Wood, a sales agent in the coal business, sues Hutchinson Coal Company, the owner of coal mines in Logan County, West Virginia, for commissions in the sum of $18,946 on sales of coal made by by the company which he claims he should have been allowed to make under the con-

tract between them. At the trial below the judge directed a verdict for the defendant. The question is whether the principal in a nonexclusive sales agency contract may compete with the agent so as to deprive him of commissions on sales which the principal makes without the agent's assistance to a customer to whom the agent has previously sold goods, on which he has been paid a commission.

Wood is an experienced and capable coal broker with offices in Chicago. Hutchinson has sales offices at Cleveland and Philadelphia. The whole contract of the parties is contained in the following passage in a letter of March 14, 1935, from Hutchinson to Wood: "This will confirm our verbal understandings and present working arrangements by which we will continue to pay you 10c per ton commission on coal sold by you direct to customers and accepted and shipped by our Logan County mines." The company did not abolish its own sales force but made the agreement with Wood because it needed additional business and desired to take advantage of his contacts to attract new accounts, especially from among some twenty coke by-product plants which were so located as to be able to buy Hutchinson coal, a product well suited to their needs. The arrangement between the parties did not contemplate that Wood should be the sole sales agent for Hutchinson or that Wood should sell only Hutchinson coal.

The parties operated under the contract for twelve years, and the officials of the company and Wood were on friendly terms. In consideration of the commissions paid him, Wood secured orders for Hutchinson coal and serviced the contracts, that is, he looked after complaints, checked the quality of coal and negotiated supplemental price and tonnage agreements in each year on long term contracts. Between 1936 and 1942 he secured three customers for Hutchinson, and from 1942 until 1947, one customer, the Milwaukee Solvay Coke Company, in connection with whose business the present controversy arose. Hutchinson had sold coal to Milwaukee in former years but had lost the account. Hutchinson officials believed that Wood, who had sold Mil-

waukee as late as 1940, would be more able than they to win Milwaukee back, and he was able to do so. In 1942, through his efforts, Milwaukee signed a five-year agreement to buy coal from Hutchinson in an amount not to exceed 100,000 tons per year, about one-sixth of Hutchinson's entire output, with prices and shipping schedules to be arranged annually. From 1942 until 1946 sales to Milwaukee were the only sales made by Wood for Hutchinson. Indeed it is admitted that during this period there was a sellers' market, and Hutchinson had no difficulty in marketing its product. Throughout the term of the contract, Wood negotiated the annual price tonnage and shipping schedules; and the extent of his duties in servicing the contract is indicated by the fact that in 1946 he spent sixteen days in Milwaukee and made fifty long distance telephone calls to the Milwaukee Company. During the five year term of the contract, 1942 until 1946, Wood received $44,000 in commissions on sales to Milwaukee.

The Milwaukee contract expired on November 30, 1946; and Wood made no effort to renew it. In his view there was no need for haste. The shipping season ran from May until November, and there would be time enough if a new basic contract were negotiated before the end of the year and the supplemental contract, fixing prices and quantities for the ensuing year, were executed in the early part of 1947. Beginning in September, 1946, he made a number of efforts to confer in person with Robert A. Ritchie, the president of Hutchinson, about price and tonnage data so as to have a firm basis for negotiations with Milwaukee, but Ritchie put him off. He had accompanied Ritchie to Youngstown on some business in the previous August but apparently it did not occur to him then to discuss the subject of the Milwaukee contract. He did not in fact meet Ritchie again until February 9, 1947. He could, of course, have begun negotiations with Milwaukee without the data since the basic contract would not contain precise figures and the parties were entirely familiar with the product and with market conditions; but Wood, because of his long and friend-

ly relationship with Hutchinson, had no idea that Hutchinson would not allow him to handle a new contract with Milwaukee but was bargaining with Milwaukee itself. Indeed Wood was endeavoring to persuade Hutchinson to give him an exclusive agency to handle its entire output on a commission of 12c per ton, and he erroneously believed that he had some chance of success.

In the meantime, Hutchinson had made up its mind to sell directly to Milwaukee in order to avoid payment of further commissions to Wood on sales to this customer, and accordingly, before the 1942–1946 contract expired, began negotiations with Milwaukee which resulted, in October, 1946, in a new five year contract for the period 1947 until 1951, under which Hutchinson agreed to furnish Milwaukee not less than 75,000 or more than 225,000 tons of coal annually at such price as might be agreed upon between them on or before the 15th of March of each year for coal shipped during that year. On January 27, 1947, the parties entered into a supplemental agreement definitely setting the tonnage to be supplied and the price for that year. Wood learned for the first time about these new agreements on February 8, 1947. He considered his relations with the defendant terminated, and made no further effort to sell the defendant's coal.

Wood claims a commission of 10 per cent. on all coal sold or to be sold under this contract. In the present suit he claims $11,074, which represents the full commissions on coal sold up to March, 1948, when the present suit was instituted. He also claims the additional sum of $7872 as commissions on coal sold direct by Hutchinson to the Youngstown Sheet & Tube Company in March, 1947. This subject will be hereinafter discussed.

■■■ The answer to the problem raised by this controversy is found in our opinion in the rules of law announced in Sections 448 and 449 of the Restatement of Agency as follows:

"§ 448. Compensation. Agent as Effective Cause. An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result."

"§ 449. Compensation When Principal Competes. The principal does not, by contracting to pay compensation contingent upon the agent's success in accomplishing a definite result, thereby promise that he will not compete either personally or through another agent."

■■■ It is conceded that Wood had nothing to do with the negotiation or execution of the second five year contract between Hutchinson and Milwaukee; he did not make the sale and did not accomplish the specific result upon which the payment of the commission was conditioned. An attempt is made to meet the requirements of Section 448 by advancing the theory that Milwaukee was Wood's customer and hence Wood was entitled to commissions on all Milwaukee's purchases. This position, however, cannot be maintained. For obtaining the customer and making the first sale Wood was entitled to and was paid the agreed commissions, but that situation did not continue indefinitely. It is well established that the successful negotiation of a contract by an agent does not give him a right to commissions on a renewal, which he does not secure, in the absence of an express contract to that effect. Mullen & Woods v. 615 West 57th Street, 146 Misc. 599, 262 N.Y.S. 467; Harris Co. v. Buckeye Sheriff Street Realty Co., Ohio App., 40 N.E.2d 949; William Adam Schulz & Co. v. Realty Associates, Inc., Mun.Ct.N.Y., 17 N.Y.S.2d 924. The contract did not provide that commissions would be paid on all purchases made by Milwaukee or any other particular customer as is sometimes provided in a broker's contract, but only on such sales as the agent would make. He did not actually make the sale in question.

The argument is made, however, that although all this may be true, it was not Wood's fault because it came about through the unfair behavior of Ritchie in withholding helpful sales data from Wood while secretly negotiating with Milwaukee for Hutchinson's benefit. This contention brings us to a consideration of § 449 of the

Restatement which states that a principal does not promise that he will not compete with his agent by contracting to pay compensation to the agent for the accomplishment of a definite result. In the light of this established rule, which governs the parties to the contract in suit, it cannot, in our opinion, be said that Ritchie's conduct was beyond the pale of the law. Whether it should be condemned as unfair and unethical when the equities are balanced, on the one side the long time friendly relations between the men and the concealment from Wood of Ritchie's efforts to sell the customer, and on the other, the enjoyment by Wood for five years of substantial commissions on sales of coal easy to sell under market conditions and his efforts to secure an exclusive agreement at even greater commissions, we are not called upon to decide. It is sufficient to say that the terms of the contract did not forbid the principal from competition with the agent and that Ritchie's actions did not go beyond this field.

■ It goes without saying that these rules may not be applied so as to conflict with Section 454 of the Restatement which provides in effect that a principal's revocation of the agency agreement, made to avoid the payment of compensation, cannot deprive the agent of compensation for a result which he has actually accomplished.

■ It is strongly urged upon us that Hutchinson was under an obligation to terminate the agency agreement before selling to any customer of the agent; and that in the absence of an express provision in the contract, Wood was entitled to a reasonable notice of cancellation and to a reasonable opportunity to prevail upon "his customer" to buy elsewhere. We agree that an agent is entitled to reasonable notice of the termination of an agency under a contract like that in suit, and that under certain conditions, a principal may be required to pay compensation on business secured by the agent until notice is given. Emerson v. Ackerman, 233 Mass. 249, 124 N.E. 17. Such conditions were described in Gilbert v. Quinlan, 59 Hun. 508, 13 N.Y.S. 671, upon which the appellant heavily relies.

There was an agreement on the part of a stockbroker to pay the plaintiff one-half commissions for all custom that the plaintiff brought him. The plaintiff procured a customer whose transactions through the broker were in a considerable amount. Subsequently, in obedience to a change in the rules of the Board of Trade, the defendant gave notice to the plaintiff that the splitting of commissions on the customers' business would be discontinued. The court held that the plaintiff was not entitled to share commissions in the business done after he received the notice. In the course of the opinion reversing a judgment for the plaintiff, the court said:

"In the submission of the case to the jury, the court instructed the jury that this contract was one which could not last forever. It was one that was terminable at the election or option of either party; that it would have been proper for the plaintiff at any time to have taken his customer to another broker, and it was entirely competent for the broker at any time, on giving reasonable notice, to have said to him: 'The relation which existed heretofore between Miner, your customer, and myself is now severed, and hereafter it is terminated.' There was no exception to this charge, but the court was requested by plaintiff to charge that in a contract like that, if they find the agreement was to pay half the commissions on that customer's trade, they must stop trading with the customer, so he will be turned back, or else they must have the plaintiff assent to the termination of the contract,—one or the other. This the court declined to charge, and an exception was taken. The jury found a verdict in favor of the plaintiff, and from the judgment thereupon entered, and from the order denying motion for new trial, on the ground, among others, that the verdict was contrary to the evidence, this appeal is taken."

\*　\*　\*　\*　\*　\*

"\* \* \* We do not think that a contract of the kind mentioned mortgages a customer forever. It is true that such a contract cannot be terminated at once, but only after the lapse of a reasonable time, and for a good motive. But the simple

notification of the cancellation of such a contract does not prevent the having of dealings by a party with that customer at some subsequent time, without being liable to the payment of commissions to the introducer. Good faith must be at the foundation of the action of the party seeking to terminate the contract. He cannot terminate the contract merely for the purpose of getting rid of the payment of the commissions. But where a good reason arises, and proper notice is given, the contract may be terminated. The agent, if he chooses, may take his customer elsewhere if he has sufficient control over him so to do. * * *" Cf., Barrett v. Gilmour & Co., 17 L.T.R. 292, 6 Com.Cas. 72.

We are in accord with this opinion insofar as it holds that a principal, who agrees to pay commissions on the business of a particular customer without express limitation of time, must continue to pay them until he gives a notice of the termination of the arrangement; but in the pending case the principal did not attempt to terminate the contract and hence there is no occasion to apply this rule. Moreover, under the contract in our case, commissions were to be paid on specific sales accepted by the principal and not on all the business of a specific customer for an indefinite time. Wood was of course entitled to commissions on the sales to Milwaukee of which he was the procuring cause, but he was not entitled to commissions on sales which he did not make. He labors under the mistaken belief that he possessed a certain proprietary interest in the one customer which he brought to Hutchinson in 1942; but this is not so under Section 449 of the Restatement. Prospective buyers of coal, whether or not they were prior customers of Hutchinson secured by Wood, were in the field of competition that was open to both parties during the existence of the non-exclusive agency contract. Hutchinson had the right to sell them without the assistance of Wood, and Wood had the right to sell them the coal of another mine if he desired to do so.

As to the second claim on this appeal, i. e., that Wood was the procuring cause of a sale of coal to the Youngstown Sheet & Tube Company, the direction of a verdict in favor of Hutchinson was also proper. Wood's claim is based upon the fact that in August, 1946, he introduced Ritchie to the president of Youngstown at Youngstown's plant. Hutchinson had no coal to sell at the time, and the purpose of the introduction was to discuss the possibility of joint operation of the Hutchinson and Youngstown mines, which adjoined each other in Logan County, or, in the alternative, the cleaning of Youngstown coal in Hutchinson's new cleaning plant. Wood contends that the trip was intended as an opening wedge to secure Youngstown as a customer for coal, although sale of coal was not then discussed. However, Hutchinson had sold directly to Youngstown before, and no introduction was needed to bring them together. Moreover, Hutchinson's own salesman had been making periodic calls on Youngstown officials and maintaining friendly contact during the years when no coal was available for sale. Wood had no further relation with Youngstown after the introduction, and the negotiations between Hutchinson and Youngstown resulting in the contract for which commissions are claimed did not begin until about February 10, 1947, or about a week after Wood learned that Hutchinson had been dealing directly with Milwaukee. There was no substantial evidence that Wood was the procuring cause of the sale.

Affirmed.