Filed 6/20/13  Quantum Research v. Fresno Cty. Office of Educ. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| QUANTUM RESEARCH AND EVALUATION,  Plaintiff, Cross-defendant and Respondent,  v.  FRESNO COUNTY OFFICE OF EDUCATION et al.,  Defendants, Cross-complainants and Appellants. | F062880  (Super. Ct. No. 09CECG02107)  **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth, Marshall C. Whitney, Todd W. Baxter and Mandy L. Jeffcoach for Defendants, Cross-complainants and Appellants.

James E. Toothman & Associates, James E. Toothman, Joel F. Donahoe and Elizabeth A. Coleman for Plaintiff, Cross-defendant and Respondent.

-ooOoo-

This is a breach of contract action in which plaintiff sued defendants for payment under a contract pursuant to which plaintiff marketed defendants' computerized learning program to schools and school districts. Defendants cross-complained against plaintiff, asserting it failed to properly account for money it received and it sold sublicenses for the program at prices less than those called for in the contract or a valid modification of the contract. The trial court found in favor of plaintiff and awarded substantial damages. Defendants appeal, contending the trial court's interpretation of the contract was incorrect and resulted in an unconstitutional gift of public funds to plaintiff, substantial evidence did not support the damage award, and any oral modifications of the pricing schedule for sale of the sublicenses were unenforceable because the contract required all modifications to be made in writing. We reverse the award in plaintiff's favor on the complaint and affirm the judgment in its favor on the cross-complaint.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Approximately thirty years ago, defendants began using the Portable Assisted Study Sequence (PASS) program to assist students who were the children of migrant workers to continue their high school education and earn credits toward graduation, despite moving from one place to another. It began as a paper and pencil system; subsequently, Dr. Guido Prambs, the director of the PASS program, was charged with the task of converting the program to a computer-based system, using federal funding. The computerized system became known as Cyber High. With the federal funding ending in 2001, defendants began looking for other sources of funding to expand the use of the program, which they believed to be effective. Prambs met with Donald Collins, deputy superintendent of Fresno County Office of Education (FCOE), and Dr. Donald Gregory,

2.

director of media and library services for FCOE, who had experience in marketing. They decided to market Cyber High for use by nonmigrant students.[1]

Initially, defendants contracted with Dr. Leo Cardona, who had developed the PASS program, to market Cyber High. Cardona resided in Florida at that time, and contracted with Ken and Charlene Bunger to carry out the actual work of selling the program in California. From February to August 2002, Cardona and the Bungers attempted to market the program; they began with the pilot schools that were already using it, but met with resistance because the schools did not want to pay for a program they had been getting free. After several months, defendants terminated their contract with Cardona. Defendants then considered having Gregory, who was retiring from FCOE, undertake the marketing of Cyber High through his company, Quantum Research and Evaluation (plaintiff).

On October 24, 2002, plaintiff and defendants entered into a contract in which defendants, as licensors, authorized plaintiff, as licensee, to "[a]dvertise, promote, market, and distribute sublicenses for the use of" the Cyber High program. The contract required plaintiff to "[p]ay Licensor a fee of fifty percent (50%) of all monies collected by Licensee based on the per student per year of system use charges set forth in the Cyber High Pricing Schedule." Plaintiff contracted with Cal Media, the Bungers' business, to assist in marketing Cyber High.

The contract between plaintiff and defendants provided for a three-year term, with automatic renewal for succeeding three-year terms unless one of the parties gave notice that it would not be renewed. The contract renewed automatically in 2005. In 2008, however, defendants gave timely notice that the contract would be terminated effective

---

[1] The program was provided free to migrant students through a federal grant. Gregory testified that "You cannot give migrant programs to non migrant students free. It has to be reimbursed." This was the reason for marketing the program only for nonmigrant students.

October 24, 2008. Subsequent to that date, defendants contracted with Kenjo Marketing to perform marketing services for Cyber High.

This dispute turns on the meaning of a provision within paragraph 12 of the parties' contract which states: "In the event of termination by Licensor, Licensee will continue to receive 50% of all payments collected as a result of its efforts under this Agreement for a period of two years commencing from the date of termination."

Plaintiff interpreted the provision to entitle it to collect, during the two-year posttermination period, 50 percent of all purchases made by customers it had sold to at any time during the six-year contract term (former customers). Its interpretation included as customers all schools and school districts to which it had made sales, as well as all schools within a school district to which it had sold sublicenses, and the school districts of all schools to which it had sold sublicenses. Defendants, on the other hand, interpreted this provision to permit plaintiff to collect, during the two-year period, money due on purchases of sublicenses that schools or school districts *had committed to prior to October 24, 2008*, even if they had not yet completed the paperwork or paid in full prior to that date.

By agreement of the parties (interim agreement), plaintiff collected money due on, and retained its 50 percent share of, purchases that were not completed until after October 24, 2008, provided the purchaser's intent to make the purchase was formed prior to that date and the purchaser confirmed that intent in writing.

Plaintiff sued defendants to recover the 50 percent compensation it contends is due under paragraph 12 of the contract for purchases of Cyber High sublicenses that were initiated by its former customers during the two-year period after termination of the contract. Defendants denied that any further compensation was due under the contract; they contended plaintiff's interpretation of the contract would result in an unconstitutional gift of public funds by compensating plaintiff for sales it did not procure.

4.

Defendants also cross-complained against plaintiff, alleging plaintiff breached the contract by failing to render accurate accountings and failing to timely pay sales tax; they also alleged plaintiff interfered with defendants' relationship with its customers and potential customers by continuing to market the Cyber High program and by instructing purchasers to pay plaintiff for their Cyber High purchases. At trial, defendants contended plaintiff changed the prices at which it sold Cyber High sublicenses, in violation of the contractual provision setting out the prices to be charged and prohibiting plaintiff from changing the prices without a writing signed by the director of Cyber High or the Fresno County Superintendent of Schools.

After a court trial, judgment was entered in favor of plaintiff on the complaint and the cross-complaint. The trial court found that, as part of the compensation for its marketing efforts, plaintiff was to be paid, for two years after termination, for all sales that resulted from the work plaintiff performed during the contract period to procure and maintain its customers. The trial court also concluded, however, that plaintiff was required to prove a nexus between its marketing efforts and the sales made to its former customers during the two-year period; it found plaintiff met that burden, and awarded plaintiff damages of $738,771.22, which was 50 percent of the money collected for sales to former customers of plaintiff's during that period, less an amount the court found to be due to defendants.

The trial court rejected the claims in defendants' cross-complaint, concluding there was no breach of plaintiff's obligation to charge only the prices set out in the contract or in a written modification. There was no interference with defendants' contracts or business relationships by plaintiff's attempts to continue servicing and collecting from its customers during the posttermination period, and there was no evidence plaintiff failed to remit 50 percent of the money it collected to defendants. Defendants appeal, challenging the decisions on both plaintiff's complaint and defendants' cross-complaint.

5.

## I.     Interpretation of Termination Provision

### A.     Law Regarding Contract Interpretation

"Contract interpretation presents a question of law which this court determines independently." (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 472 (*Ben-Zvi*).) "A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone. [Citations.]" (*Id*. at p. 473.) If contractual language is clear and explicit, the plain meaning governs. (Civ. Code, § 1638; *Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 695.)

"Any contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable. [Citations.]" (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473.) "We may not 'create for the parties a contract which they did not make, and … cannot insert in the contract language which one of the parties now wishes were there.' [Citation.]" (*Ben-Zvi, supra*, 40 Cal.App.4th at p. 473.) "'Contract formation is governed by objective manifestations, not the subjective intent of any individual involved. [Citations.] The test is "what the outward manifestations of consent would lead a reasonable person to believe." [Citation.]' [Citation.]" (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1277.) "'A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone.' [Citations.]" (*Ibid*.) "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.)

### B.     Paragraph 12 of Contract

The contract recited that it was an agreement between plaintiff and the Fresno County Superintendent of Schools; it was signed by Gregory, on behalf of plaintiff, and by Dr. Peter G. Mehas, Fresno County Superintendent of Schools.  According to Gregory, he negotiated the language of the contract with Deborah Garabedian, an in-house attorney for FCOE, with input from Collins and Prambs.  In a fax message to Prambs dated September 15, 2002, Gregory indicated that language making *"'customer lists and tendered marketing opportunities involving the promotion of the Cyber High program'"* the property of the licensor was unacceptable.  It would be acceptable with the addition of "protective language … such as 'the contract will automatically be renewed as long as a minimum of $50,000 in sales is achieved in each contract year and that should termination occur, any monies received thereafter from clients established by [plaintiff] would continue to be paid to [plaintiff] at the same rate as established in the contract for a period of three years as "residuals."'"  Gregory was concerned plaintiff would invest a great deal and establish a client base, then someone would take the client base and get the benefit if it.

Gregory testified that language in response to his fax message was supposed to be added to the contract, but when he went to Collins's office to sign the contract, that provision was not in it and he refused to sign.  The contract went back to the legal department and language was added to paragraph 12; he then signed the contract. Gregory also testified that, at some point before he was presented with the draft of the contract that he refused to sign, he told Garabedian he wanted a provision for two years of residuals if the contract was terminated at the end of the term; he explained he wanted plaintiff to continue to receive its percentage of the fees for two years from the client base it had established.

The disputed language of paragraph 12 of the contract provides:  "In the event of termination by Licensor, Licensee will continue to receive 50% of all payments collected

7.

as a result of its efforts under this Agreement for a period of two years commencing from the date of termination." Paragraph 12 did not adopt the language suggested by Gregory in his September 15, 2002, fax message. It did not provide for a guaranteed renewal with minimum purchases or provide for a three-year residual period; it did not even mention "residuals." The contract provision did not entitle plaintiff to continue to be paid its share of any money received from customers established by plaintiff or from plaintiff's client base. By the plain meaning of the language used, the provision entitled plaintiff only to a percentage of the payments from sales that resulted from plaintiff's "efforts under this Agreement."

The contract required plaintiff to "[a]dvertise, promote, market, and distribute sublicenses for the use of [the Cyber High] program" and to "[p]rovide any and all support or technical assistance to System End Users." Plaintiff was granted a nonexclusive "right to distribute and market use of said system to sub-licensees." Plaintiff was "responsible for the collection of fees generated under this Agreement," and was required to pay defendants 50 percent of the fees collected immediately upon receipt. Defendants retained all proprietary rights to the system and plaintiff agreed "that customer lists and tendered marketing opportunities involving the promotion of the Cyber High program are the property of Licensor and will be provided to Licensor by Licensee upon termination of this Agreement."

Thus, under the contract, plaintiff was to make sales of sublicenses for the use of the Cyber High program to schools or school districts, to collect the appropriate fees, and to pay defendants 50 percent of the fees collected. Plaintiff did not contract to develop customers, establish a client list, or bring in accounts. Construing the contract as a whole, plaintiff's "efforts under this Agreement" were its efforts to sell sublicenses to schools and school districts. The fact that plaintiff saw development of long-term customers as an effective means of generating further sales did not change the nature of the services plaintiff contracted to perform in order to obtain its fees.

8.

## C. "Procuring Cause" of Individual Sales

The party claiming a commission is required to prove that its efforts were the "procuring" or "effective" cause of the sale. (*Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 465 (*Brea*); *Chamberlain v. Abeles* (1948) 88 Cal.App.2d 291, 295 (*Chamberlain*); *Willson v. Turner Resilient Floors, Inc.* (1949) 89 Cal.App.2d 589, 595 (*Willson*); *Wood v. Hutchinson Coal Co.* (4th Cir. 1949) 176 F.2d 682, 684 (*Wood*).) The parties agree with this legal proposition, but disagree on its application to this case.

Plaintiff contends that paragraph 12 is a residuals clause such that plaintiff is entitled to commissions on all sales made to its former customers within two years after the termination date. Plaintiff argues that it *procured* such sales because it *procured the customer during the contract period*.

Defendants contend that paragraph 12 requires plaintiff to prove that it procured each individual sale. It is not enough that the sale was made by a former customer of plaintiff. It must be established that plaintiff was the *procuring* or *effective cause* of each posttermination sale for which it seeks a commission.

Case law distinguishes between an agent's efforts to establish a client base and efforts to make an individual sale.

In *Lura v. Multaplex, Inc.* (1982) 129 Cal.App.3d 410, at the defendant's request, the plaintiff solicited and obtained certain business accounts for the defendant, and the defendant agreed to pay him a five percent commission on those accounts. The plaintiff had no continuing duty to service the accounts; his performance was complete when he obtained the accounts. (*Id*. at pp. 412, 414.) After two years, the defendant gave notice that it would terminate the commission payments, although the customers continued to do business with the defendant. Because there was no time limit on the commission payments in the contract, the court construed the contract to require the payments to continue until the termination of the defendant's sales to the specified accounts. (*Id*. at p. 415.)

9.

In cases involving payment of commissions or fees for *sales*, the party claiming the commission is generally required to prove that the party's efforts were the procuring cause of the sales. In *Brea* the plaintiff contracted with the defendant to procure radio advertising contracts for the defendant's radio station. After the plaintiff spent four months soliciting such sales, she had a commitment from two companies to purchase advertising; before she obtained signed contracts, however, the defendant sent other agents who obtained the contracts. The plaintiff sought to recover the commissions she should have received on the contracts she procured. The court concluded "'procure'" did not require formal consummation. (*Brea*, *supra*, 3 Cal.App.2d at p. 465.) "In its broadest sense, the word means to prevail upon, induce or persuade a person to do something. In this sense did the trial court interpret it, when it found in its findings, that the two contracts upon which it allowed a commission were secured 'as a result of plaintiff's efforts.' This was a correct interpretation of the contract." (*Ibid*.) Accordingly, the plaintiff was entitled to her commissions even though the defendant prevented her from completing the sales through signed contracts. (*Id*. at p. 466.)

In *Chamberlain* the contract between the parties required the plaintiff to use his time, efforts and business contacts to procure orders from a specified company. In order to recover his commission, the plaintiff was required to prove he was the "'effective'" or "'procuring'" cause of the sales. (*Chamberlain*, *supra*, 88 Cal.App.2d at p. 295.) "'An agent is an "effective cause," … when his efforts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him so that it is just that the principal should pay the promised compensation to him.' [Citations.]" (*Id*. at pp. 295-296, quoting Rest., Agency, § 448, com. a.) "'In its broadest sense, the word [procure] means to prevail upon, induce or persuade a person to do something.… The originating cause, which ultimately led to the conclusion of the transaction, is held to be the procuring cause.'" (*Chamberlain, supra,* at p. 296.) The plaintiff met his burden by producing evidence that he visited the potential buyer and

10.

explained the product he was selling; when told the buyer could not use the product, he worked with the buyer and an engineer to design a product that the buyer could use, and that the company he worked for could manufacture and sell to it. The court concluded this was ample evidence that the plaintiff "'set in motion a series of events which, without break in their continuity' brought about the sales in question." (*Id*. at p. 299.)

In *Willson* the appellate court applied the substantial evidence standard of review and affirmed a judgment in favor of the plaintiff-agent. There was substantial evidence that plaintiff was the procuring cause of the sales on which the jury allowed him a percentage even though he did not actually submit the bid that resulted in consummation of the transaction. He had solicited and obtained permission to submit the bid and was active in the negotiations prefatory to the bid. Although the evidence was in conflict, there was sufficient evidence from which the jury could conclude that plaintiff was the inducing cause of the sale. (*Willson*, *supra*, 89 Cal.App.2d at p. 595.)

In *Wood* the plaintiff, a coal broker, contracted with the defendant, the owner of coal mines, to receive a commission on coal sold by him to customers and shipped from the defendant's mines. The defendant had its own sales force, but wished to bring in additional business. (*Wood*, *supra*, 176 F.2d at p. 683.) Through the plaintiff's efforts, Milwaukee Solvay Company signed a five-year contract to buy coal from the defendant. When the contract expired, the plaintiff did not immediately seek to renew it. The defendant, however, directly negotiated a new contract with Milwaukee. The plaintiff sued, claiming he was due a commission on all coal sold under the new contract. (*Id*. at p. 684.)

The court upheld the judgment in favor of the defendant.

> "It is conceded that Wood had nothing to do with the negotiation or execution of the second five year contract between Hutchinson and Milwaukee; he did not make the sale and did not accomplish the specific result upon which the payment of the commission was conditioned. An attempt is made to meet the requirements of Section 448 [of the

11.

Restatement of Agency] by advancing the theory that Milwaukee was Wood's customer and hence Wood was entitled to commissions on all Milwaukee's purchases. This position, however, cannot be maintained. For obtaining the customer and making the first sale Wood was entitled to and was paid the agreed commissions, but that situation did not continue indefinitely. It is well established that the successful negotiation of a contract by an agent does not give him a right to commissions on a renewal, which he does not secure, in the absence of an express contract to that effect. [Citations.] The contract did not provide that commissions would be paid on all purchases made by Milwaukee or any other particular customer as it sometimes provided in a broker's contract, but only on such sales as the agent would make. He did not actually make the sale in question."[2] (*Wood, supra*, 176 F.2d at p. 684.)

Thus, an agreement providing that one party will bring in accounts or customers, and the other will compensate him with commissions on all sales on that account or by that customer, must be distinguished from an agreement in which one party is to be paid a commission for making sales of the other party's product. Under the former, once the customer is established, the commission is paid on all sales to that customer; under the latter, the party earns a commission only on the sales he procures through his efforts.

## D.     Statement of Decision

The trial court awarded plaintiff 50 percent commissions on all sales proceeds collected from former customers of plaintiff during the two-year period after termination. The statement of decision's rationale for this award is not clear.

On the one hand the trial court acknowledged that, "[u]nder the 'procuring cause' analysis, it is the [plaintiff's] burden to produce evidence showing that he was the procuring cause of the sale." Consistent with that rule, it concluded plaintiff bore the burden of proving "each sale after the close of the contract, for the ensuing two-years, was entered into 'as a result of its efforts.'" The trial court muddied the waters, however,

---

**2**     Section 448 of the Restatement Second of Agency (1958) provides: "An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result." (*Wood, supra*, 176 F.2d at p. 684.)

12.

by seeming to agree with plaintiff that each completed sale was not a separate transaction that had to result from plaintiff's efforts in order to entitle plaintiff to compensation. Rather, to compensate it for investing "substantial time, effort and expense in marketing an unknown program … the parties agreed to pay [plaintiff] for two years after the contract's final end date, if it was the result of work they had performed to procure the sales in the first instance." The trial court stated the contract "contemplated, and was compensating for, the marketing efforts and risk of the [plaintiff], as a result of the work it did to procure and maintain *the client*."[3] (Italics added.)

Thus, it appears that the trial court adopted plaintiff's position that paragraph 12 was a "residuals" clause, entitling plaintiff to earn commissions on all posttermination proceeds from sales to former customers of plaintiff.

### E. Plain Meaning of Paragraph 12 and Rejection of Each Party's Interpretation

In our view, the parties have each advocated interpretations of paragraph 12 that stretch the contract's words beyond their plain meaning.

Plaintiff insists that paragraph 12 is a "residuals" clause, whereby it is owed commissions on any monies received by FCOE between October 24, 2008 and October 24, 2010, for sales of Cyber High to any *former customer* of plaintiff. Thus, plaintiff's entitlement to the commissions does not depend upon, nor does plaintiff need to prove, a particular sale "resulted from its efforts," only that the sale was to a *former customer* of plaintiff.

The wording of paragraph 12 is not reasonably susceptible to plaintiff's interpretation. The fallacy of this interpretation is best illustrated by a hypothetical. Assume that the procuring cause of a particular posttermination sale to a former client of

---

**3**    Later in its decision, the court seemed to equate a "but for" test with "'result of its efforts.'" We do not regard the two as synonymous. There may be multiple "but for" causes, but in this context there can only be one "'procuring cause.'" (*Sessions v. Pacific Improvement Co.* (1922) 57 Cal.App. 1, 17 (*Sessions*).)

13.

plaintiff resulted from the efforts of FCOE or Kenjo Marketing. According to plaintiff, it would be still be owed a commission, but that would directly contradict the "efforts" language of paragraph 12 because, in this hypothetical, the sale resulted from the efforts of someone else. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 344 (*Herrera*) [parol evidence rule bars consideration of extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement].)

Plaintiff fails to recognize the difference between plaintiff's contractual entitlement to commissions during the six-year contract period and the two-year posttermination period. During the six-year period, plaintiff received commissions on all collected sales proceeds regardless of whose efforts procured the sale. For example, if a potential client placed an order for Cyber High without any input from plaintiff whatsoever, so long as plaintiff collected the money on the sale, it received a 50 percent commission. To illustrate, assume plaintiff sells Cyber High to School A in year one and then without any further marketing efforts sells Cyber High to School A in year six. Since plaintiff collected the money, it gets paid for the sale in year six even though the product sold itself or some other person or entity played a significant role in making the sale. This is so because the contract entitled plaintiff to commissions on all monies it collected during the six-year period, regardless of whether its efforts were the procuring cause of the sale. It did not have to prove that its efforts were the procuring cause in order to earn a commission during the six-year period. Its only efforts may have been to take the order and collect the money. This commission arrangement is to be distinguished from Cyber High sales during the two-year posttermination period. For monies FCOE collected *after* October 24, 2008, plaintiff's right to commissions depended not on whether plaintiff collected the sales money or whether the sale was made to a former customer of plaintiff, but on whether plaintiff could prove that those monies resulted from its efforts, i.e., that plaintiff was the "procuring cause." (*Brea*,

14.

*supra*, 3 Cal.App.2d at p. 465; *Chamberlain*, *supra*, 88 Cal.App.2d at p. 295; *Willson*, *supra*, 89 Cal.App.2d at p. 595; *Wood*, *supra*, 176 F.2d at p. 684.)

FCOE insists that paragraph 12 only entitles plaintiff to collect commissions on sales that the client *committed* to before FCOE terminated plaintiff as its selling agent.

Paragraph 12 is not reasonably susceptible to FCOE's interpretation. The fallacy of this interpretation is likewise best illustrated by a hypothetical. Assume plaintiff proved that a posttermination sale was obtained as a result of its efforts during the six-year contract period even though that customer had not *committed* to the sale as of October 24, 2008. According to FCOE, plaintiff would not be entitled to a commission, but that would directly contradict the "efforts" language of paragraph 12 because, in this hypothetical, the sale was shown to have resulted from plaintiff's efforts. (*Casa Herrera*, *supra*, 32 Cal.4th at p. 344.)

FCOE's argument that paragraph 12 only refers to sales that customers *committed* to *before* October 24, 2008, not only finds no support in the language of paragraph 12, it renders the two-year period referenced in paragraph 12 illusory. It is unlikely that a client who committed to buy Cyber High in 2008 would take up to two years to pay. There is no evidence in this record to indicate that the two-year period was selected because of a concern that a customer who committed to purchasing Cyber High in October 2008 might take two years to pay for the product. The only reasonable interpretation of paragraph 12 is that plaintiff would be entitled to a commission on any sale made during the two-year posttermination period so long as the sale resulted from efforts it made during the six-year contract period.

During the posttermination period, plaintiff was no longer authorized to market or sell Cyber High. Under paragraph 12, plaintiff doesn't earn commissions on money it collects; rather, it earns commissions on money FCOE received between October 24, 2008 and October 24, 2010, which resulted from plaintiff's efforts. And those efforts, if any, necessarily occurred on or before October 24, 2008. So, the parties contemplated

15.

that plaintiff's pretermination efforts could result in sales proceeds received up to two years after the termination. There is nothing in the language of paragraph 12 or in this evidentiary record that precludes plaintiff from trying to prove that its efforts (during their six-year relationship with FCOE) resulted in posttermination sales and collections.

Paragraph 12 means what it says. In order for plaintiff to be entitled to receive a commission on sale proceeds received between October 24, 2008 and October 24, 2010, it had to prove that the particular sale resulted from its efforts. This did not require, as FCOE urges, that plaintiff prove that the client had *committed* to the particular sale before termination. We also reject plaintiff's argument that mere proof of a sale to a former customer entitled plaintiff to a commission. Just because a former client made a later purchase does not necessarily prove that the later purchase was a result of plaintiff's efforts. The word "efforts" is the linchpin of paragraph 12. The words "committed," "residuals" and "former customers" appear nowhere in this paragraph. In order to earn a commission, plaintiff had to prove that a particular sale resulted from its efforts, that is, was the procuring cause. Consequently, we will uphold the judgment only to the extent substantial evidence supports the trial court's conclusion plaintiff was the procuring cause of each of the sales for which compensation was allowed.

### F. Substantial Evidence Does Not Support the Trial Court's Damage Award

We review the record to determine if substantial evidence supports the trial court's findings of fact. "'[T]he question of whether or not the sale is primarily the result of the broker's efforts is one of fact, and the trial court's conclusions thereon will not be disturbed on appeal if there be substantial evidence to sustain them. [Citation.]' [Citation.]" (*Jones v. Foster* (1931) 116 Cal.App. 102, 108.) We must of course indulge every reasonable inference from the evidence in favor of plaintiff. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461-462.)

The trial court concluded that:

16.

"[Plaintiff] provided adequate proof through testimony and documentation (*see* trial exhibits: 8, 9, 13, 20, 119, 153, 156 and 158 for a sampling of school districts showing 'intent' to purchase through [plaintiff]) that each and every school for which they allege purchased 'as a result of its efforts' after the conclusion of the contract, did just that. The Court is convinced, and does so find that, but for [plaintiff's] efforts in the sales at issue, the client and subsequent sale(s) would not likely have been procured. As a result, [plaintiff] is entitled to its 50% share of the sales made and money collected post October 24, 2008 through October 24, 2010 or $774,450.00, minus any accounting discrepancies."

The trial court determined that plaintiff met its burden because marketing was solely the responsibility of plaintiff, plaintiff made substantial, successful efforts to market the program, and defendants did not contribute to those marketing efforts. It also found support for its damage award in the letters of intent some schools or districts provided to plaintiff, which demonstrated that certain sales, completed after termination of plaintiff's contract, entitled plaintiff to compensation because the purchaser committed to the purchase prior to termination of the contract.

We find that substantial evidence does not support the trial court's conclusion that plaintiff met its burden of demonstrating that it was entitled to compensation for any of the posttermination sales.

First, the so-called letters of intent did not pertain to any sales for which plaintiff sought damages. Pursuant to the interim agreement, defendants paid plaintiff commissions on those posttermination sales where it was demonstrated in writing that a customer had committed to the purchase before October 24, 2008. The eight exhibits cited by the trial court in support of the damage award contained seven letters of intent concerning purchases made after October 24, 2008, *for which plaintiff was fully compensated under the interim agreement*. The intent letters in the record came from only nine of the 74 schools or school districts for whose posttermination sales plaintiff sought compensation. None of the exhibits cited by the trial court constitutes evidence

17.

that any of the posttermination sales for which plaintiff sought damages were procured by its efforts.

Second, plaintiff never introduced any documentary evidence to prove that it was the procuring cause of any of the posttermination sales for which it sought damages. Gregory, owner of Quantum, was not even asked about each of the sales represented on exhibit Nos. 33 and 37. He offered no testimony about plaintiff's efforts in procuring each of those sales. In fact, he testified that plaintiff did not procure any of those individual sales. He was asked on cross-examination, "What's before the court today from your case is the claim you have for monies FCOE received after October 24 that were not specific contracts that you procured, correct?" His answer was "Correct." He contended that paragraph 12 only required plaintiff to prove that it *procured the customers, not the individual sales*. This proof would have been sufficient under a residuals clause, but paragraph 12, as we have explained, is not such a clause.

We have reviewed all of the trial exhibits and have found none that satisfy plaintiff's burden under paragraph 12 as to any particular sale. Plaintiff introduced written statements from former customers to qualify for commissions under the interim agreement, but failed to introduce evidence from former customers to prove that any other posttermination sales resulted from its efforts. It never deviated from its contention that paragraph 12 was a residuals clause that entitled it to commissions on all sales to former customers during the two-year posttermination period.

The statement of decision asserts that plaintiff provided adequate proof that posttermination sales resulted from its efforts through "testimony." A review of the trial testimony reveals the following: Plaintiff spent six years developing a customer base for Cyber High. It engaged in various activities to market, demonstrate and sell the product. It had repeat customers. Many customers expressed their high satisfaction with the product and with plaintiff. Some schools that bought Cyber High recommended it to other schools within its school district and some districts with whom plaintiff worked

18.

recommended the program to schools within the district. FCOE did not market the program during their six-year relationship with plaintiff. FCOE also did not market the program during the two years after termination of the relationship. On November 1, 2008, FCOE contracted with Kenjo Marketing to market and sell the program. During the two-year posttermination period, product sales were either processed by FCOE (in-house sales) or by Kenjo. Both handled sales to former customers of plaintiff.

No specific testimony is mentioned in support of the court's conclusion that all posttermination sales resulted from plaintiff's efforts other than generalized references to testimony about the marketing and service activities of plaintiff during the contract period. As previously mentioned, plaintiff did not introduce any testimony to prove that it was the procuring cause of any of the posttermination sales for which it sought damages. Testimony favorable to plaintiff was elicited from representatives of the Oakland and Santa Rosa school districts, but plaintiff did not claim damages based on sales to either district and neither representative testified that its district purchased Cyber High during the two-year posttermination period because of plaintiff's efforts. In fact, plaintiff offered no evidence from any of the posttermination sales customers as to why they bought Cyber High or whether they credited plaintiff's efforts for their purchase.

It was plaintiff's burden to prove that *each sale* after October 24, 2008, was made as a result of its efforts. Where is the proof as to *each sale*? Plaintiff's answer is to paint with a broad brush: since it created a bank of satisfied customers during its six-year relationship with FCOE, it is reasonable to assume that posttermination orders be credited to those efforts. But that doesn't satisfy its burden of proving that *each sale* resulted from its efforts. Plaintiff's position is tantamount to a burden-shifting argument: by proving it established a satisfied customer base, the burden shifts to defendant to prove that the posttermination sales did not result from plaintiff's efforts. But it is plaintiff's burden to prove that each sale resulted from its efforts, not defendants' burden to prove that each sale did not result from plaintiff's efforts. By allowing plaintiff to meet its

19.

burden of proof in this way, the trial court treated paragraph 12 as a residuals clause, which we have already determined it is not.

Adopting the terminology used in the case law, it was plaintiff's burden to prove that it was the procuring cause for each sale after October 24, 2008. On this record, it is pure speculation to conclude that these sales resulted from plaintiff's efforts. There is no evidence from the individual customers as to why they made a particular purchase. Defendants argue that there are other possible explanations for why these sales occurred other than plaintiff's efforts. One is that the product sold itself, that is, former customers placed new orders because of the product's proven performance, rather than because of plaintiff's past marketing or other activities. Another explanation is that some of these sales resulted from Kenjo's efforts. Without receiving evidence from the individual customer as to why it made a particular purchase, it is speculative to say who or what the procuring cause was. (*People v. Perez* (1992) 2 Cal.4th 1117, 1133 [speculative evidence does not constitute substantial evidence].)

In an attempt to show the amount it was entitled to recover for posttermination sales of sublicenses, plaintiff presented two documents (exhibit Nos. 33 and 37), which were compilations of information from the parties' records prepared by one of plaintiff's attorneys. The attorney took plaintiff's master list of all the schools and districts to which it had sold sublicenses during the contract term (exhibit Nos. 27 and 28), and compared it with defendants' list of posttermination sales (exhibit No. 29). Exhibit Nos. 33 and 37 represent the overlap; every posttermination sale made to a school or district to which plaintiff made a sale during the contract term, every sale made to a district in which plaintiff made a sale to any school, and every sale made to a school within a district to which plaintiff ever made a sale during the contract term, is included in exhibit Nos. 33 and 37.

After termination of plaintiff's contract, customers were informed that plaintiff was no longer the official seller of the Cyber High program and further purchases were

20.

made directly from defendants. Kenjo Marketing entered into its marketing contract with defendants on November 1, 2008. The sales listed in exhibit Nos. 33 and 37 included sales defendants attributed to Kenjo Marketing, for which Kenjo Marketing was compensated under its marketing contract with defendants. Plaintiff claimed it was entitled to 50 percent of the proceeds of all of the sales reflected in exhibit Nos. 33 and 37.

The trial court awarded plaintiff the total amount shown by the exhibits, less approximately $35,000 that it determined defendants were entitled to because of discrepancies in plaintiff's records. It found a nexus between the posttermination sales and plaintiff's efforts; it stated that, "but for [plaintiff's] efforts in the sales at issue, the client and subsequent sale(s) would not likely have been procured." A procuring or effective cause, however, is one that persuades or induces a person to do something. (*Brea, supra*, 3 Cal.App.2d at p. 465.) When there are two potential causes of the sale, the court must determine which one was the predominating cause.

> "Where several agencies have been active in bringing about a sale, it may happen that each has contributed something without which the result would not have occurred. One may have found a buyer who would otherwise have been overlooked, and yet that buyer may actually make his bargain through a different instrumentality. In such case, the crucial question is, which was the predominating efficient cause? … [¶] To constitute himself … the predominating effective cause, it is not enough that the broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest. He must set in motion a chain of events, which, without break in their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities." (*Sessions*, *supra*, 57 Cal.App. at p. 17.)

Thus, it is incorrect to apply a "but for" test, for there can be several causes that satisfy that definition, including the product itself, FCOE and, as to some sales, Kenjo Marketing. Instead, case law advises that it must be determined who or what was the predominating, effective or procuring cause. And it necessarily contemplates that there is only one such cause.

21.

As to the in-house sales, we have found no direct evidence from any former customer of plaintiff that any of the posttermination sales (excluding those covered by the interim agreement) resulted from plaintiff's efforts. There was no testimony by any former customer of plaintiff that it was induced to purchase and pay for Cyber High between October 24, 2008 and October 24, 2010, due to plaintiff's marketing or other related activities.

The trial judge, citing the aforementioned exhibits, may have reasoned that because certain schools submitted letters confirming they intended to purchase Cyber High due to plaintiff's efforts prior to October 24, 2008, then all of the posttermination sales to former customers were due to plaintiff's efforts. That reasoning is grounded in speculation. It does not follow that because Schools A, B and C made purchases after October 24, 2008, and confirmed in writing that plaintiff's efforts played a significant role in those purchases that later purchases made by Schools D, E and F were also due to plaintiff's efforts. Letters submitted by certain schools confirming plaintiff's role in procuring their purchases of Cyber High are not probative as to who or what was the procuring cause for other purchases made by other schools or districts.

The only other evidence that may bear on the question of what or who was the procuring cause of these posttermination sales is the fact that FCOE itself did not market this product during the two-year period. But that only proves that the in-house sales did not result from FCOE's marketing activities. It doesn't prove that those sales resulted from plaintiff's efforts. Again, without any evidence from the individual customers as to why they made each individual purchase, it is speculative to say that it must have been plaintiff's efforts, rather than the product itself, a recommendation from someone else, or other reasons that motivated these individual customers to make each of these posttermination purchases.

The statement of decision is also flawed because it makes no distinction for sales made by Kenjo Marketing. There was evidence that, after termination of plaintiff's

contract, Kenjo actively marketed the program to schools throughout the state. Plaintiff presented no evidence that schools that purchased from Kenjo Marketing did so as a result of plaintiff's efforts, rather than the more immediate efforts of Kenjo Marketing. The statement of decision did not discuss the respective sales efforts of the two marketers in procuring the particular sales that were attributed to Kenjo Marketing in exhibit Nos. 33 and 37. The trial court seemed to assume that, because plaintiff was the first marketer, all of the posttermination sales should be attributed to plaintiff without regard to any marketing efforts by Kenjo Marketing. The trial court made this assumption despite evidence that some of the purchases in exhibit Nos. 33 and 37 were made by entities whose only purchases from plaintiff had occurred years earlier. For example, exhibit Nos. 33 and 37 reflected a purchase made by Valley Center – Pauma through Kenjo Marketing in December 2009; plaintiff's records reflected purchases by Valley Center – Pauma in 2002 and 2003. Plaintiff presented no evidence demonstrating that its efforts six years earlier "set in motion a chain of events, which, without break in their continuity," (*Sessions, supra*, 57 Cal.App. at p. 17) caused Valley Center – Pauma to make its December 2009 purchase, despite the subsequent efforts of Kenjo Marketing.

Plaintiff offered no evidence that it was the procuring cause of sales made by Kenjo Marketing *unless* one adopts plaintiff's "residuals" interpretation of paragraph 12, that is, plaintiff is entitled to a commission on all posttermination sales to its former customers. Substantial evidence does not support the conclusion that plaintiff was the predominating effective cause of the posttermination sales attributed to Kenjo Marketing.

The trial court effectively converted plaintiff's marketing contract into a contract that compensated plaintiff for obtaining customers or accounts rather than sales. Or, it *assumed* that because plaintiff made efforts to market the program during its contract term and those efforts resulted in orders from particular customers during that term, subsequent orders by the same customers must also have been the result of those efforts, but assumptions do not constitute proof that individual sales were in fact the result of

23.

plaintiff's efforts.  Neither this court nor the trial court can rewrite the parties' contract. (*Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co.* (1964) 228 Cal.App.2d 810, 815.)  Under the contract, plaintiff can recover only for sales procured through its efforts.  Substantial evidence does not support the trial court's determination that sublicenses purchased from Kenjo Marketing after termination of plaintiff's marketing contract were procured through plaintiff's efforts.  Therefore, plaintiff's damage award cannot stand.

## II.  Admissibility of Exhibit Nos. 33 and 37

Defendants contend exhibit Nos. 33 and 37 were improperly admitted as compilations of information from business records.  They assert the exhibits were inadmissible because they were prepared by plaintiff's attorney rather than by plaintiff through its personnel, and only plaintiff's attorney testified to their preparation.  We find no error in their admission, but regard this claim as moot in light of our reversal of plaintiff's damage award.

## III.  Cross-complaint for Unauthorized Changes in Pricing

Defendants contend the trial court erred in denying them damages on their claim that plaintiff sold Cyber High courses at prices other than those set forth in the contract, without obtaining a written agreement, signed by defendants, to modify the price list. They contend the contract required a signed writing and, where a public entity's contract includes such a requirement, the contract cannot be modified orally.  They base their argument on *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104 (*Katsura*) and *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332 (*P&D*).

Civil Code section 1698 provides that a written contract may be modified in writing or orally if the oral agreement is executed by the parties.  In some circumstances, a contract with a public entity may not be modified orally.

In *Reams v. Cooley* (1915) 171 Cal. 150 (*Reams*), the plaintiff entered into a contract with a school to perform certain construction work.  Before it was completed, the board of trustees arranged to have the plaintiff perform additional work.  The school

24.

superintendent refused to approve payment for the additional work because it was not performed under a contract awarded as a result of competitive bidding. (*Id*. at p. 151.) By statute, the contract could only be awarded through the competitive bidding process. Therefore, the contract was void "because of irregularities committed which go to the jurisdiction of the high school board." (*Id*. at p. 152.) The court also rejected a quantum meruit claim.

> "Undoubtedly, a school board, like a municipal corporation, may, under some circumstances, be held liable upon an implied contract for benefits received by it, but this rule of implied liability is applied only in those cases where the board or municipality is given the general power to contract …. [T]he decided weight of authority is to the effect that when by statute the power of the board or municipality to make a contract is limited to a certain prescribed method of doing so and any other method of doing it is expressly or impliedly prohibited, no implied liability can arise for benefits received under a contract made in violation of the particularly prescribed statutory mode. Under such circumstances the express contract attempted to be made is not invalid merely by reason of some irregularity or some invalidity in the exercise of a general power to contract, but the contract is void because the statute prescribes the only method in which a valid contract can be made, and the adoption of the prescribed mode is a jurisdictional prerequisite to the exercise of the power to contract at all and can be exercised in no other manner so as to incur any liability on the part of the municipality. Where the statute prescribes the only mode by which the power to contract shall be exercised the *mode* is the *measure* of the power. A contract made otherwise than as so prescribed is not binding or obligatory as a contract and the doctrine of implied liability has no application in such cases. [Citations.]" (*Reams, supra*, 171 Cal. at pp. 153-154.)

The court reached a similar result in *South Bay Senior Housing Corp. v. City of Hawthorne* (1997) 56 Cal.App.4th 1231. The plaintiff sued the city for breach of a lease. The city contended there was no enforceable lease because the mayor did not sign one. By statute, in a general law city like the defendant, a lease of city-owned property was required to be approved by the city council and, unless the city council provided otherwise by ordinance, it was required to be signed by the mayor. (*Id*. at p. 1236.) The

city council had not provided otherwise, so the lease was required to be signed by the mayor. (*Ibid*.) Citing *Reams*, *supra*, 171 Cal. 150, the court distinguished between a city contracting pursuant to a general power to contract and one contracting pursuant to a statute that imposes limits on the city's power to make certain contracts to a certain prescribed method. (*South Bay Senior Housing Corp. v. City of Hawthorne*, *supra*, at p. 1235.) Because the city's power to contract was governed by statutes that prescribed the method to be used in contracting, the contract would be void if it did not comply with that method, """"the only method in which a valid contract [could] be made."""" (*Ibid*.) The adoption of the prescribed mode was a jurisdictional prerequisite to the exercise of the power to contract at all. Consequently, the contract was not enforceable unless it was signed by the mayor. (*Id*. at pp. 1235-1236.)

In *Katsura*, a chartered city entered into a written contract with a firm of consulting engineers. The contract required modifications to be made in writing. The city's charter required contracts to be in writing and approved by specified city officials; it allowed the city council to authorize the city manager to make certain types of contracts with or without a writing. (*Katsura, supra*, 155 Cal.App.4th at p. 108.) The city manager had delegated his authority to sign contracts to the public works director, who signed the contract with the plaintiff. The plaintiff sought payment for extra work, which was requested by an associate engineer employed by the city and an outside consultant hired by the city as project manager. (*Ibid*.) The plaintiff sued when the city refused to pay because he failed to obtain a contract modification. (*Id*. at p. 107.)

"'[A] charter city may not act in conflict with its charter. [Citations.] Any act that is violative of or not in compliance with the charter is void.' [Citation.] … 'Certain general principles have become well established with respect to municipal contracts .… It is … settled that the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable.' [Citation.]" (*Katsura, supra*, 155 Cal.App.4th at pp. 108-109.)

26.

The city charter did not authorize execution of oral contracts by city employees who did not have the requisite authority. (*Katsura, supra*, 155 Cal.App.4th at p. 109.) "The alleged oral statements by the associate city engineer and project manager are insufficient to bind the City. '"No government, whether state or local, is bound to any extent by an officer's acts in excess of his … authority."' [Citations.]" (*Ibid*.) A person dealing with a public officer is presumed to know the extent of the officer's powers to bind the public agency; "'"any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted."' [Citation.]" (*Ibid*.) The court concluded that, regardless of the plaintiff's knowledge or lack of knowledge of the extent of the individuals' authority, the request for extra work by the associate city engineer and project manager was neither a modification of the contract nor a basis for recovery on an implied-in-law or quasi-contract theory. (*Id*. at pp. 109-110.)

In these cases, the court recognized that, where a city charter or statute establishes the only method by which the public entity may enter into a valid contract, a contract purportedly made by the public entity in some other manner is void. Where, however, there is no statute or charter prescribing the method by which the public entity may create a contract, general contract rules apply.

In *P&D*, the court described its holding in broad terms: "Unlike private contracts, public contracts requiring written change orders cannot be modified orally or through the parties' conduct." (*P&D, supra*, 190 Cal.App.4th at p. 1335.) The plaintiff sued the city for breach of a civil engineering contract, seeking payment for extra work; the city contended the plaintiff was not entitled to recover in the absence of a written change order. The contract prohibited modification without a written agreement signed by both parties. The parties agreed in writing to five change orders. The plaintiff asked for a further change order to cover other work, and there was disputed evidence regarding whether the project manager orally agreed to "'take care of it.'" (*Id*. at p. 1338.)

After summarizing *Katsura*, the court noted that the plaintiff in *Katsura* was trying to enforce an oral modification of a contract. It extended the reach of that decision to modifications through the parties' conduct, concluding that *Katsura's* "reasoning applies equally to modification through conduct." (*P&D*, *supra*, 190 Cal.App.4th at p. 1341.) The *P&D* court did not, however, adequately discuss or apply that reasoning. It did not discuss whether there was any statutory or charter provision prescribing the only method by which the city could enter into or modify contracts. Nor did it discuss whether the project manager, who allegedly made the oral modification agreement, had the requisite authority to bind the city through such an agreement. Consequently, we are not persuaded that the rule is as broad as described in *P&D*.

The contract in this case was not awarded after public bidding. We have been cited to no statute that prescribes the acceptable method or methods for entering into a valid contract of the sort in issue in this case. We have not been cited to any statute that requires the modification of such a contract to be made in writing. Although the contract itself required that any variance in the pricing schedule be approved in writing by Prambs or the superintendent of schools, under general contract law, such a contract could nonetheless be modified by an executed oral agreement in the absence of a statute providing otherwise. (See Civ. Code, § 1698, subd. (d).)

Gregory testified that he always obtained Prambs's approval before charging anything other than the prices in the schedule, although the approval was not always reflected in a signed writing. Prambs gave written approval for one price change, which lowered the price per course when a greater number of courses were purchased. It was undisputed that Prambs orally approved another price change, lowering the price of summer school courses; he did not sign the written proposal, but placed it in a file and accepted it as authorized. Prambs denied agreeing to other price changes. Thus, there was evidence, though disputed, that the pricing changes were approved by the representative of defendants to whom the contract expressly granted the authority to

28.

agree to pricing changes. Unlike the associate city engineer and the project manager in *Katsura*, Prambs was not an employee lacking the requisite authority to bind defendants.

There was also evidence that the oral modifications of the pricing schedule were executed. Plaintiff sold courses to schools and school districts at the modified prices, collected the money due, provided the courses to the purchasers, remitted 50 percent to FCOE, and informed FCOE orally or through spreadsheets or other records of the number of courses sold and the price paid. Defendants were either informed of the price paid per course, or were able to calculate it based on records or oral information reflecting the total price and the number of courses sold. There was no evidence defendants ever objected to the prices being charged by plaintiff during the contract term, despite the availability of this pricing information.

On appeal, the burden of affirmatively demonstrating error is on the appellant. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.) Defendants failed to meet this burden. They failed to demonstrate that a statute precluded the parties from modifying the contract's pricing schedule by any means other than a signed writing. As a result, they failed to establish that the *Katsura* rule applied to the contract in issue and prevented an oral modification. The undisputed evidence indicated the representative of defendants that plaintiff asserted made the oral agreement was one of the two school officials authorized to approve a pricing change. Substantial evidence supported the trial court's conclusion that he did so.

## IV.    Gift of Public Funds

Defendants contend that if paragraph 12 is interpreted to entitle plaintiff to compensation for posttermination sales that were procured without effort on plaintiff's part, then the contract would provide for an unconstitutional gift to plaintiff of public funds. The constitutional provisions defendants cite, however, prohibit granting "extra compensation or extra allowance to a … contractor after service has been rendered or a

contract has been entered into and performed." (Cal. Const., art. IV, § 17; Cal. Const., art. XI, § 10, subd. (a).)

In light of our determination that plaintiff has failed to prove any entitlement to damages, this issue is rendered moot.

## V. Prejudgment Interest

Plaintiff argues that it was entitled to prejudgment interest on its damage award. This issue is rendered moot in light of our reversal of plaintiff's damage award.

### *DISPOSITION*

The judgment in favor of plaintiff on its complaint is reversed. The judgment in favor of plaintiff on FCOE's cross- complaint is affirmed. Each party will bear its own costs on appeal.

_____

Kane, J.

WE CONCUR:

_____

Wiseman, Acting P.J.

_____

Levy, J.

30.